# United States Court of Appeals

## For the First Circuit

------------

No. 99-1390

MICHAEL HARRIS AND WENDY HARRIS,

Plaintiffs, Appellees,

v.

HARVARD PILGRIM HEALTH CARE, INC.,

Defendant, Appellant,

------------

No. 99-1557

MICHAEL HARRIS AND WENDY HARRIS,

Plaintiffs-Appellants,

v.

HARVARD PILGRIM HEALTH CARE, INC.,

Defendant-Appellee.

------------

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

------------

Before

Stahl, Circuit Judge,

Cyr, <u>Senior Circuit Judge</u>,

and Lipez, <u>Circuit Judge</u>.

---

Kenneth W. Salinger, with whom Steven L. Schreckinger and Palmer & Dodge LLP were on brief for Plaintiffs.

Paul R. Collier, III, with whom Collier, Shapiro & McCutcheon was on brief for Defendant.

---

March 31, 2000

---

**CYR, <u>Senior Circuit Judge</u>.** Harvard Pilgrim Health Care, Inc. ("HPHC"), an ERISA plan administrator, appeals from a district court judgment directing it to defray its <u>pro rata</u> share of the legal fees expended by plan members Michael and Wendy Harris ("the Harrises") in obtaining an earlier tort action settlement, part of which settlement the Harrises were contractually obligated to remit to the plan. For their part, the Harrises cross-appeal from district court orders (i) directing them to reimburse the plan for medical benefits previously received, and (ii) dismissing their state-law action for unfair or deceptive trade practices.

## I

## BACKGROUND

After Michael Harris sustained personal injuries in a 1991 motorcycle accident, HPHC remitted $102,874.29 toward his medical costs pursuant to the ERISA plan. Thereafter, the Harrises sued the party allegedly responsible for the accident. HPHC in turn filed a $102,874.29[1] state-law lien against any award the Harrises might obtain in their legal action. The HPHC lien was predicated principally on the subrogation provision in the ERISA plan:

> H.4. SUBROGATION. If another person or entity is, or may be, responsible to pay for expenses or services related to the Member's illness and/or

---

[1]HPHC initially filed its lien for $136,384.80, but later revised the amount upon notification that $102,874.29 was the entire amount attributable to injuries sustained in the motorcycle accident.

4

injury which [HPHC] paid or provided, then [HPHC] is entitled to subrogation rights against such person or entity. [HPHC] shall have the right to proceed in the name of the Member, with or without his or her consent, to secure right of recovery of its cost, expenses, or the value of services rendered under this Agreement. [HPHC] is also entitled to recover from a Member the value of services provided, arranged, or paid for, when the Member was reimbursed for the cost of care by another party.

H.5. MEMBER COOPERATION. The Member agrees to cooperate with [HPHC], and to provide all requested information, and to assign to [HPHC] any monies received for services provided or arranged by [HPHC]. The Member will do nothing to prejudice or interfere with the rights of [HPHC].

(Emphasis added.); see also Mass. Gen. Laws Ann. ch. 111, § 70A.[2]

The Harrises eventually settled their lawsuit for $737,500, $264,727.31 of which was for their attorney fees and costs. Their attorney purportedly settled the suit at two-thirds its estimated value after assessing the risks of litigation, particularly allegations that Harris had been intoxicated and exceeding the speed limit at the time

---

[2]Section 70A provides, in pertinent part:

[A]ny health maintenance organization which has furnished health services . . . to a person injured in . . . an accident shall, subject to the provisions of [§ 70B], have a lien for such benefits, upon the net amount payable to such injured person, his heirs or legal representative out of the total amount of any recovery or sum had or collected or to be collected, whether by judgment or by settlement or compromise, from another person as damages on account of such injuries.

5

of the accident.  HPHC took no part in the settlement.

In their 1997 lawsuit, the Harrises alleged that the HPHC lien was excessive because the reimbursement requirement in the ERISA plan ought not take effect unless and until the Harrises were made whole by the settlement, whereas they had received only two-thirds of their estimated damages from the settlement.  Second, the Harrises claimed, under the equitable common-fund doctrine HPHC should bear its proportionate share of the $264,726 attorney fee incurred by the Harrises in generating the settlement fund from which HPHC demanded reimbursement.  Finally, the Harrises argued that the excessive lien claim asserted by HPHC constituted a breach of contract and violated the Massachusetts unfair or deceptive trade practices act.  See Mass. Gen. Laws Ann. ch. 93A.  HPHC thereafter counterclaimed for lien enforcement and the parties submitted cross-motions for summary judgment.

The district court ruled that:  (1) the breach of contract and chapter 93A claims brought by the Harrises were preempted, see Harris v. Harvard Pilgrim Health Care, Inc., 20 F. Supp. 2d 143, 147-48 (D. Mass. 1998); (2) as were the lien provisions in Mass. Gen. Laws Ann. ch. 111, § 70A, see id. at 148-49; (3) HPHC possessed a contractual right to reimbursement for all its medical payments to Harris, regardless whether the tort settlement made the Harrises whole, see id. at 149-51; and (4) HPHC was responsible for a pro rata share of

6

the legal fees incurred by the Harrises since the subrogation clause in the ERISA plan is silent as to attorney fees, and the common-fund, fee-shifting doctrine should be adopted as federal common law under ERISA, see id. at 152-53.

HPHC appeals the second and fourth rulings; the Harrises cross-appeal the first and third rulings.

## II

## DISCUSSION

### A. The HPHC Appeal

HPHC claims that the district court erred in adopting, as federal common law, the rule that an ERISA-plan subrogee is liable for its proportionate share of the attorney fees expended by a plan member in generating the settlement fund. It argues that ERISA requires deference to the plain language of the subrogation clause contained in the ERISA plan, which in this instance neither mentions attorney fees specifically, nor qualifies its general language that HPHC is entitled to recover "the value of services provided, arranged, or paid for."[3]

The issue thus presented is one of first impression in this circuit. Among the courts of appeals which have considered it, the majority view is that an ERISA plan need not contribute to attorney

---

[3]As the HPHC plan does not vest the administrator with discretion to interpret its terms, the district court interpretation was plenary, see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), and we review its interpretation de novo, see Recupero v. New England Tel. & Tel. Co., 118 F.3d 820, 828 (1st Cir. 1997).

7

fees where its plain language gives it an unqualified right to reimbursement.  <u>See, e.g.</u>, <u>Walker</u> v. <u>Wal-Mart Stores, Inc.</u>, 159 F.3d 938, 940 (5th Cir. 1998); <u>United McGill Corp.</u> v. <u>Stinnett</u>, 154 F.3d 168, 172-73 (4th Cir. 1998); <u>Health Cost Controls</u> v. <u>Isbell</u>, 139 F.3d 1070, 1072 (6th Cir. 1997); <u>Bollman Hat Co.</u> v. <u>Root</u>, 112 F.3d 113, 116-17 (3d Cir. 1997); <u>Ryan</u> v. <u>Federal Express Corp.</u>, 78 F.3d 123, 127-28 (3d Cir. 1996).  Since "one of the primary functions of ERISA is to ensure the integrity of written, bargained-for benefit plans[,]" <u>United McGill</u>, 154 F.3d at 172, generally speaking ERISA does not mandate that a covered plan include particular substantive provisions.  Thus, "the plain language of an ERISA plan must be enforced in accordance with 'its literal and natural meaning.'"  <u>Id.</u> (citation omitted).

The majority of courts construing state laws which regulate non-ERISA insurance contracts have read the common-fund doctrine into contractual clauses giving insurers an unqualified right to reimbursement from their insureds.  <u>See, e.g.</u>, <u>York Ins. Group of Maine</u> v. <u>Hall</u>, 704 A.2d 366, 368 n.3 (Me. 1997).  Typically, these courts have read the reimbursement clauses' silence on the issue of attorney fees as an ambiguity, then based their holdings on the prevailing state-law principle that ambiguities in insurance policies must be construed in the insured's favor.  <u>See</u> <u>id.</u> at 369.

By contrast, however, ERISA creates precisely the opposite presumption: unqualified plan provisions need not explicitly rule out

8

every possible contingency in order to be deemed unambiguous. ERISA merely requires that covered plans be "'sufficiently accurate and comprehensive to reasonably apprise such ["average plan"] participants and beneficiaries of their rights and obligations under the plan.'" Walker, 159 F.3d at 940 (quoting 29 U.S.C. § 1022(a)(1) (summary plan description)). It therefore follows that an ERISA plan which unambiguously requires its members to reimburse the plan for all benefits paid does preclude offsets for attorney fees. See id.[4]

Notwithstanding the great weight of contrary authority, the

_____

[4]The Harrises argue that the plan language involved in some of these cases was more prohibitive than Section H.4 of the HPHC plan in this case. See, e.g., Ryan, 78 F.3d at 124 ("[T]he Plan shall have the right to recover, against any source which makes payments or to be reimbursed by the Covered Participant who receives such benefits, 100% of the amount of covered benefits paid . . . ."). However, given the policy objectives underlying ERISA, supra, the courts have found no meaningful distinction between such provisions and one like the present, which gives the plan an unqualified right to reimbursement of "any monies received for services provided or arranged by [HPHC]." See, e.g., United McGill, 154 F.3d at 172 (rejecting distinction); see also, e.g., Walker, 159 F.3d at 940 ("The PLAN shall have the right to reduce benefits otherwise payable by the PLAN or recover benefits previously paid by the PLAN to the extent of any and all of the following: A. Any payments resulting from a judgement or settlement . . . ."); United McGill, 154 F.3d at 170 ("Our right of subrogation will be to the extent of any benefits paid or payable under this plan, and shall include any compromise settlement . . . ."); Health Cost Controls, 139 F.3d at 1071 ("[I]n no event will the amount of reimbursement to the Insurance Company exceed the lesser of: 1. The amount actually paid under the Plan . . . ."); Bollman, 112 F.3d at 114 ("In the event of any payment under the Plan to any covered person, the Plan shall, to the extent of such payment, be subrogated, unless otherwise prohibited by law, to all the rights of recovery of the covered person arising out of any claim or cause of action which may accrue because of alleged negligent conduct of a third party.") (emphasis omitted).

district court was persuaded — mistakenly in our view — by the decision in Waller v. Hormel Foods Corp., 120 F.3d 138 (8th Cir. 1997). Waller dealt with a plan markedly different from the provisions construed in the cases we have cited. See supra note 4. The Waller plan merely provided: "In the event of any payment by the [plan] for health care expenses, the [plan] shall be subrogated to all rights of recovery which you or your dependent, receiving such payment, may have against any person or organization." Waller, 120 F.3d at 139. Thus, the Waller plan neither defined the term subrogation, nor vested the plan with a direct right of reimbursement to all benefits paid in behalf of the plan member.

Furthermore, reimbursement and subrogation are distinct remedies. Subrogation empowers the plan to stand in the shoes of its member, and thus to enforce the plan member's rights and remedies against third parties through litigation. By contrast, reimbursement affords the plan a direct right of recovery against the plan member. See Provident Life & Accident Ins. Co. v. Williams, 858 F. Supp. 907, 911 (W.D. Ark. 1994). Thus, Waller held simply that a plan member might interpret the term "subrogation" to mean that "the Plan will pay reasonable fees and expenses so as to encourage beneficiaries to press claims to which the Plan will be partially subrogated." Waller, 120 F.3d at 141. No such inference would be compelled, however, were the plan to seek recovery, not through subrogation, but independently,

based on its own right to direct reimbursement.

The Harrises rely as well on several district court decisions which have held that the common-fund, fee-sharing doctrine may be read into otherwise unqualified ERISA subrogation provisions.  See, e.g., Hartenbower v. Electrical Specialties Co. Health Benefit Plan, 977 F. Supp. 875, 885 (N.D. Ill. 1997); Carpenter v. Modern Drop Forge Co., 919 F. Supp. 1198, 1205-06 (N.D. Ind. 1995); Martz v. Kurtz, 907 F. Supp. 848, 855-56 (M.D. Pa. 1995), rev'd per curiam, 92 F.3d 1172 (3d Cir. 1996); Provident Life, 858 F. Supp. at 912; Serembus v. Mathwig, 817 F. Supp. 1414, 1423-24 (E.D. Wis. 1992).  However, these decisions were based on the problematic premise that the common-fund doctrine would serve one of the congressional goals in enacting ERISA:  "'to ensure that plan funds are administered equitably, and that no one party, not even the plan beneficiaries, should unjustly profit.'" Martz, 907 F. Supp. at 856 (citation omitted).  Assuming, without deciding, that the courts may supplement ERISA by formulating federal common law "when 'necessary to effectuate the purposes of ERISA,'" United McGill, 154 F.3d at 171 (citation omitted); see Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987), in our view forefending against "unjust enrichment" is too amorphous a concept to warrant wholesale importation of the common-fund doctrine into an otherwise unambiguous ERISA plan.  We explain.

"A primary purpose of ERISA is to ensure the integrity and

11

primacy of the written plans . . . [so that] the plain language of an ERISA plan should be given its literal and natural meaning." Health Cost Controls, 139 F.3d at 1072 (citing Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489 (1st Cir. 1989)) (emphasis added). Against this plain legislative purpose, if the ERISA plan expressly provides that its members are obligated to reimburse the plan for "the value of services provided, arranged, or paid for," we do not think it can be considered "unfair" to require plan members to abide by the agreement. See Ryan, 78 F.3d at 127 ("'Enrichment is not "unjust" where it is allowed by the express terms of the . . . plan.'") (citation omitted); cf. Pierce v. Christmas Tree Shops, Inc., 706 N.E.2d 633, 636 n.5 (Mass. 1999) (rejecting same argument, under Massachusetts law); cf. also Health Cost Controls, 139 F.3d at 1072 (noting that defendant "has not identified to this Court that application of a set-off under a[n] equitable common fund doctrine would advance any explicit statutory purpose of ERISA").

Nor does the rule we adopt today threaten to undermine any other ERISA goal. At least in cases like the present, where the settlement amount exceeds the sum total of the attorney fees incurred by the plan member and the plan's reimbursement claim, the member will have a continuing incentive to pursue settlements to his own net financial benefit, even assuming the plan will not be contributing to the attorney fees. See Bollman, 112 F.3d at 117 (refusing to reach

12

"hypothetical" situation "where a plan participant's third party recovery is less than the plan's subrogation claim plus attorney fees," since "[this] third party settlement fully financed [] attorney's fees and the subrogation claim").

For the foregoing reasons, the district court order directing HPHC to defray a pro rata share of the Harrises' attorney fees must be vacated.[5]

## B.    The Harrises' Cross-Appeal

### 1.    The "Make Whole" Doctrine

The Harrises further contend that the district court erred in declining to adopt the so-called "make whole" doctrine as federal common law under ERISA. Under the "make whole" doctrine, an insurer-subrogee may receive reimbursement for benefits previously paid to the insured only if the insured has obtained a settlement or judgment that fully compensates for the total losses sustained by the insured; otherwise, the insured would not owe the insurer any reimbursement, or at most would owe a pro rata share of its partial tort recovery. See Cagle v. Bruner, 112 F.3d 1510, 1520 (11th Cir. 1997) (citing 16 Couch on Insurance § 61:64 (2d ed. 1983)). The Harrises argue that since the tort settlement compensated them for only two-thirds of their actual

_____

[5]Since we affirm the district court ruling that the plan entitled HPHC to full reimbursement, we need not reach the "alternative" argument raised by HPHC: that ERISA does not preempt the Massachusetts lien statute. See supra note 2.

losses in the motorcycle accident, they either owe HPHC nothing or at most $68,582.86.

Their contention presents yet another issue of first impression in this circuit. Some courts of appeals have held that an ERISA plan, which affords the plan administrator an unqualified right to reimbursement for all ERISA benefits paid to a plan participant, unambiguously precludes importation of the common-law "make whole" doctrine. See Waller, 120 F.3d at 140 (ERISA plan need not provide for "first priority" reimbursement); Sunbeam-Oster Co. v. Whitehurst, 102 F.3d 1368, 1374-76 (5th Cir. 1996) (unconditional plan provision implies reimbursement "to the full extent" of benefits previously paid, "regardless of [the] source"); cf. Cutting v. Jerome Foods, Inc., 993 F.2d 1293, 1299 (7th Cir. 1993) (finding no abuse of discretion in plan administrator's interpretation of plan provision as precluding "make whole" doctrine). Other courts of appeals take the opposite position. See Cagle, 112 F.3d at 1521-22 (requiring that plan provide for "first reimbursement" to preclude "make whole" doctrine); Barnes v. Independent Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan, 64 F.3d 1389, 1395 (9th Cir. 1995) (same).

Although the "make whole" doctrine could be imported as federal common law under ERISA, see Pilot Life, 481 U.S. at 56, in our view it should be done only as necessary to effectuate legitimate ERISA policy objectives, see United McGill, 154 F.3d at 171. Thus, we

14

decline to adopt the "make whole" doctrine as federal common law in the present circumstances, for the following reasons.

First, as with the attorney-fee question, see supra Section II.A, generally speaking ERISA does not superimpose substantive provisions on covered plans. Where an ERISA plan requires —without qualification — that plan participants reimburse the plan for benefits paid, the plan should not be construed to depend upon an implied contingency such as the "make whole" doctrine, particularly since ERISA specifically envisions that covered plans be written in straightforward language comprehensible by the average plan participant. See Sunbeam-Oster, 102 F.3d at 1374-75. In such circumstances, "the absence of more particularized and technical legal language addressing the partial recovery situation cannot be grounds for supplanting the Plan Priority rule." Id. at 1376. Similarly, the instant ERISA plan explicitly "entitled [HPHC] to recover from a Member the value of services provided, arranged, or paid for, when the Member was reimbursed for the cost of care by another party."

Moreover, there are cogent arguments for the view that ERISA objectives could be disserved if the "make whole" doctrine were to be adopted as the ERISA default rule. Although plan members like the Harrises would benefit financially, ultimately the costs would be borne by all other plan members in the form of higher premiums for coverage. See id. at 1376 n.23.

15

The "make whole" doctrine entails other undue burdens as well. For example, though the Harrises settled their tort claims in order to eliminate the risks and burdens of litigation, the "make whole" doctrine would necessitate that their claims nonetheless be litigated in the district court — including the contentious contributory negligence claim — in order to determine whether the Harrises were fully or only partially compensated by the $737,500 tort settlement.

For the foregoing reasons, we hold that where the terms of an ERISA plan confer upon it an unqualified entitlement to reimbursement for the value of the services provided to a member, the ERISA plan administrator need not demonstrate that the settlement fund, from which reimbursement is sought, fully compensated the plan member.

16

## 2. **Preemption of State-Law Claim**

Finally, the Harrises contend that the district court incorrectly ruled that ERISA preempts their state-law claims, particularly their claim that HPHC's lien recovery policies and procedures constitute unfair or deceptive trade practices. See Mass. Gen. Laws Ann. ch. 93A. Specifically, the Harrises argue that HPHC unfairly files reimbursement liens for "any medical charge that could be caused by the accident," without consulting medical authorities to ensure that the charges were in fact attributable to the accident at issue. Thus, HPHC originally attempted to assert a lien for $136,384.80, rather than $102,874.29. See supra note 1. The Harrises further allege that HPHC knowingly refrains from disclosing to plan members that it will pursue full reimbursement for all charges under the plan's subrogation/reimbursement clause, without any reduction to reflect (i) that the plan participant has not been made whole by the settlement, or (ii) the pro rata share of the attorney fees expended by HPHC in achieving the settlement.

The district court ruling that ERISA preempts state-law causes of action is reviewed de novo. See Demars v. CIGNA Corp., 173 F.3d 443, 445 (1st Cir. 1999). ERISA will be found to preempt state-law claims if the trier of fact necessarily would be required to consult the ERISA plan to resolve the plaintiff's claims. See, e.g., Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 793-94 (1st Cir.

17

1995) (citing <u>Ingersoll-Rand Co.</u> v. <u>McClendon</u>, 498 U.S. 133, 140 (1990)); <u>McMahon</u> v. <u>Digital Equip. Corp.</u>, 944 F. Supp. 70, 72 (D. Mass. 1996).

The Harrises nonetheless insist that since the ERISA plan is silent as to HPHC's lien policies, the terms of the ERISA plan are immaterial to their Chapter 93A claim. As previously noted, however, <u>supra</u> Sections II.A & II.B.1, the HPHC plan is <u>not</u> silent on these matters. Rather, its subrogation provision places the average plan participant on plain notice that HPHC will seek full reimbursement, <u>i.e.</u>, without any offset either for attorney fees or for the "make whole" doctrine.

Accordingly, the state-law claims for unfair and deceptive trade practices are preempted by ERISA.[6]

### III

### CONCLUSION

As the subrogation clause in the ERISA plan did not require that HPHC defray any attorney fees incurred by the Harrises, the

---

[6]To the extent the Harrises rely on the fact that HPHC originally valued its lien at $136,384.80 — <u>i.e.</u>, $33,510.51 more than its revised lien of $102,874.29 — they assert no cognizable claim for damages under Chapter 93A, since they do not contend that the revised lien included any amounts not attributable to medical services received by Michael Harris on account of the motorcycle accident. <u>See</u> <u>Warner-Lambert Co.</u> v. <u>Execuquest Corp.</u>, 691 N.E.2d 545, 547 (Mass. 1998) (Chapter 93A plaintiff must prove damages).

portion of the district court order which directs otherwise is vacated.[7]

In all other respects, the district court judgment is affirmed.  The

parties shall bear their own costs.

**SO ORDERED**.

---

[7]Prior to oral argument, HPHC assertedly submitted a motion to strike the Harrises' addendum summarizing the holdings in several ERISA decisions, as an attempt to circumvent the limitations in Fed. R. App. P. 32(a)(7)(B)(i) (setting 14,000-word limit on party's "principal brief").  The Clerk's office has no record of such a filing, however.  Moreover, the Harrises claim they never received notice of the filing.  Although we grant HPHC's motion on its merits, we emphasize that counsel are to take reasonable steps to verify that pertinent motions are docketed and served on opposing counsel before oral argument.  We note, however, that our decision would have been no different had the materials in the Harrises' addendum been entitled to consideration.

19