391 F.3d 563
 Paul KRESS, Plaintiff-Appellant,
v.
FOOD EMPLOYERS LABOR RELATIONS ASSOCIATION and United Food and Commercial Workers Health and Welfare Fund, Defendant-Appellee, and
Giant Food Stores, Incorporated, Defendant.
 No. 03-2269.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 26, 2004.
 Decided: December 10, 2004.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Louis Fireison, Bethesda, Maryland, for Appellant. Terra Elswick Castaldi, Morgan, Lewis & Bockius, L.L.P., Washington, D.C., for Appellee. ON BRIEF: Darin L. Rumer, Louis Fireison & Associates, P.A., Bethesda, Maryland, for Appellant. Harry W. Burton, Donald L. Havermann, Morgan, Lewis & Bockius, L.L.P., Washington, D.C. for Appellee.
 Before WILKINSON and TRAXLER, Circuit Judges, and HAMILTON, Senior Circuit Judge.
 Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge TRAXLER and Senior Judge HAMILTON joined.
 OPINION
 WILKINSON, Circuit Judge.
 
 
 1
 Paul Kress, a participant in his employer's welfare benefit plan, was injured by a third party in an automobile accident away from work. Under such circumstances, the plan will advance participants accident-related expenses. The Summary Plan Description emphasizes that such payments are in the nature of a "service" to the plan's members, because "[r]ecovery from a third party can take a long time."
 
 
 2
 In order to receive the advance, participants and their attorneys must execute a subrogation agreement to reimburse the plan "before all others" from any third-party recovery. Kress's attorney refused to sign the agreement. After the 180 day time limit expired, the claim for the advance was denied. Kress brought suit, alleging that denying benefits because of the attorney's refusal to sign was wrongful under ERISA, 29 U.S.C. § 1001 et seq. The district court granted summary judgment to the plan. Because the SPD was clear and in no way violated ERISA, we affirm.
 
 I.
 A.
 
 3
 The Food Employers Labor Relations Association & United Food and Commercial Workers Health and Welfare Fund ("Fund") is a multi-employer welfare benefit plan governed by ERISA. It resulted from collective bargaining between unions and the employers. The Fund is administered by its trustees, half of whom are appointed by the unions, and half by the employers. The governing plan document, the Summary Plan Description ("SPD"), grants the trustees "the discretion to interpret the terms of this document" and to "interpret and apply its terms in situations not expressly addressed" in the SPD.
 
 
 4
 Participation in the Fund depends upon being "employed" by a participating employer. There are six ways to maintain this status: (1) actively working; (2) being on paid vacation; (3) being on jury duty; (4) collecting accident and sickness benefits; (5) collecting workers' compensation from a participating employer; and (6) being on leave covered by the Family and Medical Leave Act. Dependents of participants are covered as well, so long as the participant maintains his or her "employed" status.
 
 
 5
 Although "[b]enefits are not payable if the disability is due to an injury or sickness which, as determined by the Trustees, is ... the responsibility of" a third party, the Fund does assist its participants in such situations by advancing them funds to cover the extraordinary expenses. The SPD conditions such accident and sickness benefits on participants and their attorneys signing a Subrogation Agreement ("Agreement"). The SPD and the Agreement require that the Fund be reimbursed "in full" if the participant recovers from a third party; they also allow the Fund to litigate the suit if the individual does not. The SPD provides:
 
 
 6
 Waiting for a third party to pay for these injuries may be difficult. Recovery from a third party can take a long time (you may have to go to court), and your creditors will not wait patiently. Because of this, as a service to you, the Fund will pay your (or your eligible dependent's) expenses based on the understanding that you are required to reimburse the Fund in full from any recovery you or your eligible dependent may receive, no matter how it is characterized. This process is called "subrogation."
 
 
 7
 ...
 
 
 8
 The Fund extends benefits to you and your dependents only as a service to you. The Fund must be reimbursed if you obtain any recovery from another person or entity's insurance coverage.
 
 
 9
 ... [Y]our acceptance of benefits from the Fund means that you have agreed to reimburse the Fund — in full — for any benefits it has paid from any settlement, judgement, insurance, or other payment you, your eligible dependent, or your attorney receive as a result of your accident. It does not matter how these amounts are characterized, why they are paid, or whether or not these other payments are specified as being for your Accident and Sickness or Medical bills. The Fund requires that you and/or your eligible dependent (if applicable) and your or your dependent's attorney fill out, sign, and return to the Fund office a subrogation agreement that includes a questionnaire about the accident. Your claim will not be deemed complete and will be pended for payment until your fully executed subrogation agreement is received by the Fund office. If it is not completed in a timely fashion, your claim will be denied.
 
 
 10
 (emphasis added). The SPD requires that the Subrogation Agreement be "fully executed" within 180 days. The Agreement, though not the SPD, explicitly states that reimbursement of the Fund has a priority "before all others."
 
 B.
 
 11
 Partly because he valued the benefits the Fund would provide him and his dependents, Paul Kress chose to work for Giant. He was an employee at a Giant grocery store in Silver Spring, Maryland, and he was a Fund participant.
 
 
 12
 On November 14, 2000, Kress was injured by a third party. He "was stopped at a traffic light when [he] was hit from behind due to no fault of [his own]." After the accident, Kress was no longer actively working. Therefore, of the six methods of maintaining his connection to the Fund, Kress now only qualified on the basis of his receipt of accident and sickness benefits.
 
 
 13
 Although it denied Kress's claim for benefits because his injury was caused by a third party, the Fund sent Kress the Agreement so that he could receive his expenses subject to its terms. Kress indicated that he wished to avail himself of the subrogation option. In anticipation of a properly completed Agreement, the Fund advanced Kress over $1500. He signed the Agreement, but his attorney refused, writing to the Fund that "attorney fees and related costs must be paid first." The Fund then contacted Kress, warning him that his claim was in jeopardy — but that he could rectify the situation by directing his attorney to sign the Agreement. This did not happen, and the Fund notified Kress that he was therefore not eligible for accident and sickness benefits. Because of this, his last connection to the Fund was severed, and his and his dependents' benefits were terminated.
 
 
 14
 In May 2002, Kress filed suit in Maryland state court. The action was subsequently removed to the U.S. District Court for the District of Maryland. Kress sought a declaratory judgment, recovery of plan benefits, and damages for breach of fiduciary duty. The gravamen of his claims was that the SPD did not — and could not legally — require his attorney's signature on an Agreement as a condition for coverage. The district court, concluding that the SPD did in fact require precisely that, and that ERISA in no way impeded such a requirement, granted summary judgment for the Fund in September 2003. Kress v. Food Employers Labor Relations Ass'n, 285 F.Supp.2d 678 (D.Md.2003). This appeal, which Kress limits to the question of whether the Fund can condition the receipt of benefits on the attorney's signature, followed.
 
 II.
 
 15
 We review a grant of summary judgment de novo. Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 56 (4th Cir.1995). When an ERISA plan denies benefits, that decision is reviewed under an abuse of discretion standard, if — as here — plan administrators are granted discretionary authority to interpret the plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In the case before us, however, the Fund's discretionary authority is not implicated, because the terms of the plan itself are clear.
 
 III.
 A.
 
 16
 Kress argues that the SPD does not authorize the Fund to condition benefits on the attorney signature since "[t]he specific terms of that agreement are not found within" the SPD. It follows, he claims, that the SPD is ambiguous with respect to the contents of the Subrogation Agreement — in particular, the Agreement's requirement that the plaintiff reimburse the Fund from any tort recovery "before all others." Therefore, he argues, the Fund cannot "unilaterally" enforce the Agreement, but must negotiate its contents. We think, however, that the SPD clearly establishes the Fund's priority status.
 
 
 17
 We first turn to the plain language of the SPD to determine whether it in fact authorizes the Fund's actions. "[T]he plain language of an ERISA plan must be enforced in accordance with `its literal and natural meaning.'" United McGill Corp. v. Stinnett, 154 F.3d 168, 172 (4th Cir.1998) (quoting Health Cost Controls v. Isbell, 139 F.3d 1070, 1072 (6th Cir.1997)).
 
 
 18
 The SPD emphasizes that participants must reimburse the Fund. The SPD employs such phrases as reimbursement "in full," from "any recovery," "no matter how it is characterized." The SPD insists that funds are advanced "only as a service to you," that the reimbursement must come from "any recovery," and that "acceptance of benefits" connotes agreement to reimburse "in full" from "any settlement, judgment, insurance, or other payment" received, including payments "your attorney receive[s]." Only someone determined to seek loopholes could read this refrain to mean anything other than that the Fund refuses to subsidize any part of the litigation, including attorney fees.
 
 
 19
 The SPD does not explicitly use the phrases "attorney fees" or "before all others." But this does not render it ambiguous. "[U]nqualified plan provisions need not explicitly rule out every possible contingency in order to be deemed unambiguous." Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 278 (1st Cir.2000). SPDs — Summary Plan Descriptions — are required by statute to "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a) (2000). The SPD plainly requires both the attorney and the participant to sign the Agreement and that the Fund's own recovery be "in full." If others had a priority — particularly the very attorney whose signature is required for a complete claim — the Fund often could not be reimbursed in full. The SPD's meaning could therefore hardly be clearer. We will not create a Catch-22, under which a plan is either hopelessly complicated and legalistic — in violation of § 1022(a) — or "ambiguous" and subject to unwarranted judicial scrutiny.
 
 B.
 
 20
 Since the SPD is unambiguous, Kress must turn to ERISA. He argues that the Fund cannot require an attorney to be bound by an Agreement, even if the SPD clearly requires it. While the Fund may stand in his shoes, Kress says, it cannot use subrogation to stand in his attorney's shoes. According to Kress, this would allow the Fund to benefit from litigation proceeds without sharing in litigation expenses.
 
 
 21
 We adhere to plan documents unless they contravene ERISA or other binding authority. But ERISA "does not mandate any minimum substantive content for [welfare benefit] plans." Stinnett, 154 F.3d at 172. "[E]mployers have large leeway to design disability and other welfare plans as they see fit." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Since third-party accident and sickness benefits are not even covered by the Fund, nor required by ERISA, it makes little sense to argue that ERISA precludes imposing conditions on the receipt of benefits that are in effect an interest-free loan.
 
 
 22
 Indeed, "ERISA neither requires a welfare plan to contain a subrogation clause nor does it bar such clauses or otherwise regulate their content." Ryan by Capria-Ryan v. Federal Express Corp., 78 F.3d 123, 127 (3d Cir.1996). Subrogation clauses requiring reimbursement are, in fact, quite common. See Amber M. Anstine, Comment, ERISA Qualified Subrogation Liens: Should They Be Reduced to Reflect a Pro Rata Share of Attorney Fees?, 104 Dick. L.Rev. 359, 360 (2000). ERISA allows plans broad discretion to draft such clauses. Plans could forego any reimbursement unless and until the participant is "made whole." They could provide for attorney fees to be paid in full before the plan is reimbursed at all. They could share the expense of legal fees in a pro-rata fashion, proportionally reducing their reimbursement to reflect the attorney fee. They could adopt a "reasonable fee" policy, meaning that they will subtract from the amount of the required reimbursement whatever they would have spent in legal fees to recover the advance they had paid. Or, as here, they may require that attorney fees be paid only after the Fund is reimbursed in full. See Sunbeam-Oster Co., Inc. Group Benefits Plan v. Whitehurst, 102 F.3d 1368, 1372-74 (5th Cir.1996) (discussing different possibilities but recognizing that it is the language of the plan that determines which applies).
 
 
 23
 As shown above, a plain reading of the Fund's SPD must acknowledge an unqualified right to reimbursement. We have already noted that "[w]here ... the language of the Plan does not qualify the right to reimbursement by reference to the costs associated with recovery, we are bound to enforce the contractual provisions as drafted." Stinnett, 154 F.3d at 173. We held in Stinnett that when plan language unambiguously requires full reimbursement, the participant may not withhold a portion of that reimbursement in the name of covering attorney fees. This does not depend on any particular amount of recovery. Absent some provision in the SPD or Agreement for fees, the Fund's priority is paramount — it must recover before all others. See also Harris, 208 F.3d at 277 (listing cases agreeing with the "majority view [ ] that an ERISA plan need not contribute to attorney fees where its plain language gives it an unqualified right to reimbursement").
 
 
 24
 The addition of an attorney signature requirement is a difference of degree, not of kind. In Walker v. Wal-Mart Stores, Inc., 159 F.3d 938 (5th Cir.1998), the plan participant had received over $40,000 from the plan, but settled her case for $12,500. The plan provision stated that it had the right to "recover benefits previously paid by the PLAN to the extent of any and all of the ... payments resulting from a judgment or settlement, or other payment or payments" by responsible third parties. Id. at 940 (capitals in original). Although there was no attorney-signed subrogation agreement, as the Fund requires here, the Fifth Circuit still found that the plan unambiguously declined to provide for a "reduction of its subrogation lien for payment of attorneys' fees or costs." Id.
 
 
 25
 Since circuit law interpreting ERISA plainly permits a plan to recoup any advance it has made to a participant before an attorney makes a claim on a subsequent award, we see no reason to impede a plan from requiring pre-commitment to this state of affairs. Congress placed no restrictions in ERISA on reimbursement provisions. Were we to import such limits now, we would contravene ERISA's purpose of "promot[ing] the interests of employees and their beneficiaries in employee benefit plans," Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), because such restrictions would surely discourage plan sponsors from providing the very sorts of accident and sickness benefits that the Fund offered to Kress.
 
 C.
 
 26
 Kress insists finally that the Fund's policy is "unconscionable" and will discourage litigation. He believes that attorneys will not take cases when their fees are subordinated to plan reimbursement, because this forces attorneys to bear the costs of litigation while the Fund need not share the burden.
 
 
 27
 But this purported unfairness is nothing more than commonplace economic calculus. Attorneys considering taking a case on contingency commonly factor the likelihood of success and the magnitude of recovery into their decision. "[M]any tort claims involve considerable risk and insufficient reward. Attorneys, however, carefully screen these claims and reject a large portion, includ[ing] most denominated as high risk." Lester Brickman, The Market for Contingent Fee-Financed Tort Litigation: Is It Price Competitive?, 25 Cardozo L.Rev. 65, 98 (2003). A given plan's subrogation rules obviously make the payment of fees more or less likely, and prudent attorneys would factor those rules into their calculus as well. If the participant and his attorney conclude that private litigation will not produce a sufficient recovery to make the litigation worthwhile, they need not bring the case. Often, however, an attorney might estimate that a jury award or settlement — with possible pain and suffering damages — will far exceed the amount to be reimbursed to a plan. This is the same calculation commonly made in non-ERISA contexts, but with one further factor to add to the equation.
 
 
 28
 In the final analysis, policy arguments such as these all go to the economic judgment of the Fund, and should be directed to its trustees, or to Congress, rather than to the federal courts. After all, ERISA generally leaves it to plan sponsors — not courts — "to adopt, modify, or terminate welfare plans." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). If the Fund concludes that its subrogation rules are too severe and that they harm, rather than help, its bottom line, it may choose to alter them. In all events, ERISA does not make that choice for it.
 
 IV.
 
 29
 Throughout this litigation, Kress's arguments have proceeded on the premise that the Fund's provisions are somehow inimical to participants' interests.[1] But that is hardly the only interpretation that one could give them. The Fund has no obligation to provide advance expenses to someone injured outside the workplace by a third party, yet it does so to tide participants over difficult times. The provisions here broadened rather than narrowed the options for Fund participants. Nothing required Kress to accept the subrogation option; he was free to reject it and commence litigation at once, with no obligations whatever to the Fund.[2] But if he did accept the Fund's offer, and then recovered in tort, it was not wrongful for the Fund to seek to recoup this expenditure to provide for future participants who may find themselves in similarly straitened circumstances. The Fund "must serve the best interests of all Plan beneficiaries, not just the best interest of one potential beneficiary." Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 234 (4th Cir.1997).
 
 
 30
 Moreover, the Fund was clear and direct about its policies. The SPD conditions accident and sickness benefits on the Fund's right to unqualified reimbursement. Because the plan is clear, and because nothing in ERISA or any other statute precludes it, the judgment of the district court is
 
 
 31
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 The termination of his dependents' benefits has been called "retaliatory," for instance. The Fund, however, was created through the collective bargaining process and its trustees are equally divided between union and employer representatives. And the SPD plainly notes that the Fund covers dependents only if the participant remains "employed." Since the last connection of Kress to the Fund was severed when his accident and sickness benefits claim was denied due to counsel's refusal to sign the Subrogation Agreement, termination of his dependents' remaining benefits followed as a matter of course under the plan's terms
 
 
 [2]
 Even if he did accept the advance, he was under no obligation to sue. If he took the money and did not file suit, he would never have to reimburse the Fund. In such situations, the SPD allows the Fund to file suit at its discretion — again, with no cost to the participant