**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TOM COLUCCI,

*Plaintiff-Appellee,*

v.

AGFA CORPORATION SEVERANCE PAY
PLAN,

*Defendant-Appellant.*

No. 05-1095

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
Henry M. Herlong, Jr., District Judge.
(CA-03-955)

Argued: September 20, 2005

Decided: November 28, 2005

Before NIEMEYER and SHEDD, Circuit Judges, and
James C. DEVER, III, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

Reversed and remanded with instructions by published opinion. Judge
Niemeyer wrote the opinion, in which Judge Shedd and Judge Dever
joined.

## COUNSEL

Glenn Eric Butash, PITNEY HARDIN, L.L.P., Morristown, New Jersey, for Appellant. Robert Edward Hoskins, FOSTER LAW FIRM, L.L.P., Greenville, South Carolina, for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

The issue presented in this case is whether Agfa Corporation, the administrator of the Agfa Corporation Severance Pay Plan (the "Severance Plan" or "Plan"), abused its discretion in awarding severance benefits to Tom Colucci. Rejecting Colucci's claims that his severance benefits should have been calculated from his original employment date with Agfa of January 17, 1983, Agfa Corporation determined that Colucci's "Employment Commencement Date," by which severance benefits were to be calculated, was the August 2000 date on which Colucci was *rehired* by Agfa after having voluntarily left Agfa to work for the Kodak Corporation.

Colucci commenced this action against the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), challenging the Plan's determination to base severance benefits on the last two-year period of his service. The district court agreed with Colucci and held that the terms of the Plan provided for severance benefits based on the *first* date that Colucci ever worked for Agfa — the 1983 date — not the date he returned to Agfa from Kodak — the 2000 date. Finding the Plan's terms unambiguous in this regard, the court concluded that the Plan's administrator abused its discretion by using the rehire date and reversed the Plan's determination.

Because we find the Severance Plan's language to be, at a minimum, ambiguous, we conclude that the district court should have deferred to the administrator's interpretation because the Plan gave it discretion to resolve such ambiguities. Accordingly, we reverse and remand for entry of judgment in favor of the Plan.

I

Tom Colucci began his employment in the communications group for the Agfa Corporation in Ridgefield Park, New Jersey, on January 17, 1983. As an employee not covered by a collective bargaining agreement, Colucci qualified for benefits under the Agfa Corporation's Severance Pay Plan when that plan was established on January

1, 1999. The Plan provided generally for severance benefits for involuntary separation, calculated on the length of an employee's years of service. Severance benefits were not payable, however, upon an employee's voluntary resignation from Agfa.

Following Agfa's 1999 acquisition of Sterling Diagnostics in Greenville, South Carolina, Colucci transferred from Agfa's New Jersey office to Greenville to become head of Agfa's communications for North America. Colucci, however, became dissatisfied with this move, and he voluntarily resigned from Agfa on May 12, 2000, to take a job at Kodak, in charge of global communications for one of its units. Because of his voluntary resignation, Colucci did not then receive any severance benefits under the Severance Plan. About three months after having left Agfa, however, Colucci quit Kodak and returned to work for Agfa on August 7, 2000, as head of global communications for Agfa's Impax product.

On April 17, 2002, Colucci was involuntarily terminated for economic reasons. Upon his departure from Agfa, the Severance Plan awarded Colucci severance benefits calculated on the period of his employment from August 7, 2000, when he returned to Agfa from Kodak, to April 17, 2002, when his employment was terminated. Believing that his severance payments should have been calculated from his first employment date in 1983, Colucci administratively appealed the decision to the Agfa Corporation Benefit Plan Administrative Committee (the "Administrative Committee"). He contended that because of changes in his assignment and work circumstances in Greenville, South Carolina, his 2000 departure to Kodak and resulting break in work from Agfa was "involuntary." As he explained, "I felt like an outsider. I was disappointed by John Glass [a senior executive at Agfa's headquarters in Belgium]. I felt that the former Sterling [Diagnostics] had a plan. So I left." Colucci concluded in his appeal papers, "The main issue for now is the severance package; I received only credit for two years, when in fact I had worked for Agfa for nineteen."

The Administrative Committee, a separate body of Agfa employees whose members were appointed by Agfa's Board of Directors, met on September 17, 2002, together with Agfa's outside counsel, Glenn Butash, to consider Colucci's appeal. According to the minutes of that

meeting, the Administrative Committee found that when Colucci was rehired after working for Kodak, he made no special arrangement to have his Employment Commencement Date adjusted to January 17, 1983, his original employment date with Agfa. The Administrative Committee also found that Colucci had been notified that it was company policy not to adjust Employment Commencement Dates absent such a special arrangement. Therefore, the Administrative Committee unanimously denied Colucci's appeal. In its letter of September 25, 2002, announcing its decision to Colucci, the Administrative Committee stated:

> You voluntarily resigned from the Company and then were re-hired. At the time of your first termination of employment, you were not entitled to any severance benefit because you voluntarily resigned from Agfa. Thereafter, when you were re-hired, you had a new "Employment Commencement Date" for purposes of the Plan.

Disagreeing with the Administrative Committee's decision, Colucci commenced this action against the Plan to recover severance benefits, as well as attorneys fees, under ERISA, 29 U.S.C. §§ 1132(a)(1)(B) and 1132(g). The parties stipulated to the material facts and agreed that the court could dispose of the matter, based upon the stipulation "without need for formal filing of Motions and without need for Hearing, unless the Court desires."

Ruling on the papers submitted by the parties, the district court issued an order dated December 23, 2004, concluding that the Administrative Committee abused its discretion in interpreting the Plan contrary to its plain and unambiguous language. The court held that the Plan provided benefits calculated from the "first day of employment" and that an employee has only one "first day of employment." The court noted that "no language in the Plan provides that the employment commencement date becomes the rehire date if an employee returns to work for AGFA after voluntarily leaving." Concluding that Colucci began working for Agfa on January 17, 1983; resigned voluntarily on May 12, 2000; was rehired by Agfa on August 7, 2000; and was terminated involuntarily on April 7, 2002, the court ordered the Plan to pay Colucci benefits based on an employment period beginning on January 17, 1983, and ending April 7, 2002, less the three-

month period that he worked for Kodak. From the district court's judgment, the Plan filed this appeal.

II

The parties have stipulated to the Severance Plan's terms, and they argue on appeal only about their meaning and the standard of judicial review.

Section 1.02 of the Plan states the Plan's purpose to provide "eligible employees with certain severance pay benefits in the event of an eligible termination of employment." Section 4.01(a) of the Plan defines an eligible termination of employment to include an employee's "involuntary termination of employment . . . due to . . . declining business conditions," and § 4.02 provides that a "Severed Employee will not be eligible for any severance benefit under this Plan if his or her employment with an Employer terminates for one of the following reasons: (a) Voluntary resignation."

Under § 4.01(a), an eligible employee is entitled to a "full severance benefit, in the amount determined under Appendix A, based upon the Severed Employee's Full Years of Service." Under Appendix A, an employee whose "Full Years of Service" is less than 3 years receives 4 weeks of compensation, and an employee with 19 years receives 38 weeks of compensation. Severance pay depends entirely on an employee's "Full Years of Service," which the Plan defines in § 2.12 as:

> [T]he number of months of employment during the period beginning with an Employee's Employment Commencement Date and ending on his or her Employment Severance Date, excluding any period of time not actively employed by an Employer, divided by twelve (12). An Employee who is (i) not actively employed by an Employer, and (ii) eligible to receive benefits under the Employer's long term disability plan will be considered "actively employed" for purposes of determining Full Years of Service under this Plan.

Therefore, to calculate an employee's "Full Years of Service," § 2.12 of the Plan requires a seemingly simple computation: after identifying

an employee's employment commencement and severance dates and determining the number of months between them, one must subtract the number of months that the employee was "not actively employed" and then divide by 12. The calculation, however, is dependent upon identifying the relevant dates, which the Plan defines as follows:

> Section 2.10 *Employment Commencement Date*. "Employment Commencement Date" means the first day on which an Employee is employed by an Employer.

> Section 2.11 *Employment Severance Date*. "Employment Severance Date" means the date the notice period provided for in Section 4.07 of the Plan expires with respect to a Severed Employee or would have expired but for the Severed Employee's receiving pay in lieu of the applicable notice.

Section 5.01 provides that Agfa is the administrator of the Plan and that it has retained responsibility for carrying out its provisions except insofar as administrative review is conducted by the Administrative Committee.

Applying these provisions, Agfa determined that Colucci's "Full Years of Service" equaled two years because his "first day" of employment was August 7, 2000, his most recent date of hire after returning from Kodak. The district court concluded that Colucci's "first day" was January 17, 1983, the first day that Colucci was ever employed by Agfa. Accordingly, it directed the Plan to compute Colucci's severance pay based on the periods that Colucci worked for Agfa both before he left for Kodak and after he returned.

### III

The parties agree that the Severance Plan is governed by ERISA. *See* 29 U.S.C. § 1002(1). Even though an employee benefit plan is regulated by ERISA, however, it remains a contractual type of document to be enforced by employing contract principles. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989); *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 340-41 (4th Cir. 2000); *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995). Accord-

ingly, we begin with the general principle that ERISA plans are interpreted by the courts *de novo* "by looking to the terms of the plan and other manifestations of the parties' intent." *Firestone*, 489 U.S. at 113; *see also Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996).

When a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation. *Firestone*, 489 U.S. at 111; *Booth*, 201 F.3d at 341. In those circumstances, a court will not disturb an administrator's decision as long as it is reasonable. *See Firestone*, 489 U.S. at 111; *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1185-86 (4th Cir. 1989). This is because the plan, in conferring discretion on a trustee with respect to a specific matter, deliberately yields to the trustee's judgment on that matter, as long as it is reasonable. The plan thus recognizes that on such a matter, various reasonable decisions and interpretations could be made, and it accepts, as a contractual term of the plan, the range of decisions that a trustee could reasonably make. *Firestone*, 489 U.S. at 111 ("In determining the appropriate standard of review for actions under § 1132(a)(1)(B), we are guided by principles of trust law"); Restatement (Second) of Trusts § 187 cmt. e.

Yet, even as an ERISA plan confers discretion on its administrator to interpret the plan, the administrator is not free to alter the terms of the plan or to construe unambiguous terms other than as written. *See Kress v. Food Employers Labor Relations Ass'n*, 391 F.3d 563, 569 (4th Cir. 2004) (noting that courts are bound to enforce contractual provisions "as drafted"); *Booth*, 201 F.3d at 342 (listing the plan's language as the first factor to consider in determining whether discretion is abused). Interpretive discretion only allows an administrator to resolve ambiguity. *See Kress*, 391 F.3d at 568. Thus, for instance, if a plan unambiguously provides 20 weeks of compensation as a severance benefit for an employee who has worked for the company for 10 years, the administrator abuses its discretion by reading the plan to provide 17 weeks of compensation. Even if the plan generally confers discretion on the administrator to interpret its terms, such discretion does not confer discretion to alter the plan's terms or to read out unambiguous provisions. *Firestone*, 489 U.S. at 112 (noting that "courts construe terms in trust agreements without deferring to either

party's interpretation"); *Kress*, 391 F.3d at 567 (noting that "discretionary authority is not implicated" when the "terms of the plan itself are clear"); *Davis v. Burlington Indus., Inc.*, 966 F.2d 890, 895 (4th Cir. 1992) ("If the plan language is unambiguous, however, we would not defer to a contrary interpretation by the Board").

Yet when the plan's terms are ambiguous in the sense that its language gives rise to at least two different but reasonable interpretations and when the plan confers discretion on the administrator to interpret the plan and resolve ambiguities, a court defers to the administrator's interpretation by reviewing it only for abuse of discretion. *See Firestone*, 489 U.S. at 111; *de Nobel*, 885 F.2d at 1186.

We review the district court's determination of its standard for reviewing the plan administrator's decision and its interpretation of the plan's language *de novo*.

IV

In this case, the Plan confers broad discretionary authority on the administrator to interpret the Plan. Section 5.04(b) states that Agfa and the Administrative Committee "shall be authorized and have full discretion to interpret this Plan and to determine all questions arising in the administration, construction and application of the Plan." Consequently, if a Plan provision is ambiguous, Agfa and the Administrative Committee have discretion to resolve the ambiguity. *Cf. Booth*, 201 F.3d at 343 (involving similarly broad language).

The district court concluded, however, that the Plan's language was "clear," "plain," and "unambiguous" and that therefore the administrator exercised discretion beyond that which the plan conferred. *See Kress*, 391 F.3d at 567; *Davis*, 966 F.2d at 895; *cf. Lockhart v. United Mineworkers of Am. 1974 Pension Trust*, 5 F.3d 74, 78 (4th Cir. 1993) ("If the denial of benefits is contrary to the clear language of the Plan, the decision [of the fiduciary] will constitute an abuse of discretion" (internal quotation marks omitted)). The court pointed to the definition of "Employment Commencement Date" in the Plan, which provides that it is "the first day on which an Employee is employed by an Employer." The court concluded that because "the first day that Colucci was employed with Agfa was January 17, 1983," his sever-

ance benefits should have been computed from that date and not the date he was rehired by Agfa after having voluntarily left to work for Kodak. In short, the court concluded that the first day on which an employee is employed was self-evident and could only refer to the first day that Colucci was ever employed by Agfa.

While the district court found "first day" to be unambiguous, it unduly limited the scope of its inquiry and failed to recognize that, in the context of the entire Plan, "first day" is a term of art that begins a discrete period of time defined by the Plan as "Full Years of Service." A fuller reading of the Plan discloses that the Plan itself recognizes that a single employee can have multiple blocks of "Full Years of Service," each with a different "Employment Commencement Date," and consequently the employee can have multiple "first days." Section 4.08(b) of the Plan states:

> In the event the Severed Employee's employment is termi-nated in a manner which causes the Severed Employee to receive a severance benefit under this Plan within two (2) years of the date he or she is reemployed or reinstated with an Employer, the Severed Employee will receive a sever-ance benefit under Section 4.01 of the Plan, *with his or her number of Full Years of Service computed by adding his or her Full Years of Service prior to reemployment or rein-statement to his or her Full Years of Service after reemploy-ment or reinstatement* and subtracting the number of weeks already paid to the Severed Employee attributable to his or her termination of employment prior to reemployment or reinstatement . . . .

Because Colucci's voluntary departure from Agfa disqualified him from receiving severance benefits for his "Full Years of Service" *prior* to his departure, § 4.08(b) does not apply to Colucci's specific situation. Yet, the emphasized portion of this section crucially recog-nizes that a single "Employment Commencement Date" is not logi-cally required by the Plan's definition of "Full Years of Service." If Colucci's interpretation were correct, § 4.08(b) would have been writ-ten more straightforwardly. It would not have commanded the admin-istrator to add *one* "Full Years of Service" (with its own "first day") to a *second* "Full Years of Service" (also with its own "first day"), and

then to subtract already-paid severance. Instead, it would have commanded the administrator to begin with the *one and only* "Full Years of Service," tracing the period back to the first ever employment date and subtracting out from that larger figure the time already paid and the time not actively employed.

It is apparent from the Plan's definition and use of "Full Years of Service" that a "first day," which defines the period called "Full Years of Service," can recur throughout an employee's employ with the company. The ambiguity thus created for finding the relevant "first day" of employment is not unlike the ambiguity that a high school senior would face if asked to name his first day of school. He could give as his answer either the first day of his senior year, or the first day of high school, or the first day of kindergarten at another location. Any such response would reasonably identify his first day of school.

In like fashion, we conclude that "Employment Commencement Date" and "first day," as used in the Severance Plan, are ambiguous terms in that they can reasonably refer to different dates. Accordingly, they are susceptible to the administrator's interpretive discretion.

This conclusion would normally leave us with the question whether the Plan's exercise of its interpretive discretion in focusing on Colucci's rehire date was reasonable as determined by applying the *Booth* factors for reasonableness. *See Booth*, 201 F.3d at 342-43 (listing eight non-exclusive factors for determining whether a fiduciary's discretionary decision is reasonable). But Colucci explicitly elected not to challenge the reasonableness of the Plan's decision under the *Booth* factors, explaining:

> [B]ecause Colucci so strongly believes that the language of the plan document in the matter *sub judice* is clear and because he has thoroughly addressed the language of the plan and the goals of the plan, he will not address the other *Booth* factors discussed by the plan in its' [sic] brief because they do not appear to be in any way germane.

Yet, even though Colucci has waived any claim of unreasonableness, we nonetheless explain briefly why the Plan's discretionary decision

to define Colucci's rehire date as his "Employment Commencement Date" was not unreasonable.

The administrator of the Plan construed "Employment Commencement Date" and "first day" to refer to the "Full Years of Service" after Colucci returned to Agfa after working for Kodak. This interpretation is not an unreasonable one in view of the fact that Colucci voluntarily left Agfa after 17 years of service to become an employee of Kodak. Because he left voluntarily, under the terms of the Plan he did not qualify for severance pay. The Plan explicitly denies employees severance benefits when their severance results from their own decision to leave. Thus, the Plan concluded, with textual support, that Colucci lost his severance benefits for his first 17 years when he voluntarily left Agfa in May 2000 to work for Kodak. When he was rehired by Agfa in August 2000, severance benefits began to accrue anew from this "first day" of employment, and it was these benefits that were awarded to Colucci when his employment was involuntarily terminated in 2002. Not only is this interpretation of the Severance Plan reasonable, it makes the Plan's application to Colucci's factual circumstance more coherent and consistent with the Plan's other terms and purposes. And this interpretation surely fulfills most of the *Booth* factors.

Because the Plan did not abuse its discretion in construing ambiguous provisions, we reverse the district court's judgment.

V

Colucci urges us not to defer to the Severance Plan's decision under an abuse of discretion standard, but rather to scrutinize it less deferentially because the Plan administrators had a conflict of interest. He points to three factors that he believes demonstrate this conflict of interest. First, he notes that "Agfa is the funder of the plan. However, Agfa is also the plan sponsor, plan administrator and benefits administrator." Second, the Administrative Committee "is made up of Agfa employees." Third, the Administrative Committee's counsel, Mr. Butash, advised "the plan committee as to its[ ] fiduciary duties and, therefore, in reality, [was] acting for the plan participant. . . . [H]e was acting on behalf of Colucci and he should not be defending a case brought against the plan by Colucci."

We have indeed recognized that "[a] fiduciary's conflict of interest . . . may operate to reduce the deference given to a discretionary decision of that fiduciary. . . . [A] court, presented with a fiduciary's conflict of interest, may lessen the deference given to the fiduciary's discretionary decision to the extent necessary to 'neutralize any untoward influence resulting from that conflict.'" *Booth*, 201 F.3d at 343 n.2 (quoting *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir. 1993)).

But the simple and commonplace fact that a plan's administrator is also its funder is not enough to support a finding of a conflict of interest that would cause an adjustment to our deference. *See de Nobel*, 885 F.2d at 1191. The circumstances under which we have suggested a conflict of interest might arise are when a plan is managed by its insurer, whose revenue comes from fixed premiums paid by the plan's sponsor. In such a case, we were willing to assume that the insurer-administrator's profit motives unavoidably factored into its decisions to accept or deny plan members' claims:

> To the extent that Blue Cross has discretion to avoid paying claims, it thereby promotes the potential for its own profit. That type of conflict flows inherently from the nature of the relationship entered into by the parties and is common where employers contract with insurance companies to provide and administer health care benefits to employees through group insurance contracts.

*Doe*, 3 F.3d at 86.

There is a material difference, however, between a corporation whose business profits primarily derive from managing ERISA plans and a corporation that collaterally manages a plan through which it chooses to provide its employees with benefits. We question how a company that creates, funds, and administers a plan for its own employees' benefit can, from those facts alone, be presumed to have a financial conflict in administering that plan when the company remains free to end the plan altogether. The company's business plan could not be dependent on its denying benefits, as might have been the case in *Doe*, because it could decide to deny *all* benefits simply by ending the plan should the benefits become too burdensome. When

a company sponsors a plan and then administers it, the fact that the benefits cost money is insufficient to support the presumption of a conflict; that cost is the product of its election to provide the employees with benefits. Colucci has neither alleged nor demonstrated how Agfa's administration of its Plan was driven by any interest other than its will to apply the terms under which it elected to provide benefits to its employees.

Colucci maintains that in any event other circumstances indicate Agfa managed its Severance Plan under a conflict of interest. But these arguments are no more persuasive. First, Colucci points out that Agfa has not hired independent employees to administer the Plan. This fact alone does not support the presumption of a conflict of interest, or even bias. *See Johannssen v. District No. 1-Pac. Coast Dist., MEBA Pension Plan*, 292 F.3d 159, 176 n.14 (4th Cir. 2002). Colucci would have to demonstrate more. For instance, we have found a conflict of interest when an employee demonstrated that the administrator, who was *closely* aligned with the plan sponsor's leadership, relied on *biased* information provided by the plan's sponsor. *See id.* at 176-77. But Colucci's bare factual observation that Agfa employees sit on the Administrative Committee does not raise a suspicion about the Administrative Committee's decisionmaking integrity. He offers no evidence that the Administrative Committee was exposed to unfair evidence or that the Committee's members were so closely aligned with Agfa's leaders (assuming the leaders had improper motives) that we should impute improper motives to the Committee's members.

Finally, Colucci suggests that a conflict of interest could be presumed from the attendance of Butash (Agfa's outside counsel) at the Administrative Committee's meeting because Butash was advising the Committee and at the same time acting for Colucci. This suggestion, however, misunderstands the pertinent inquiry. Whether we heighten our scrutiny depends on an administrator's purported conflicts, not conflicts of the administrator's counsel. Moreover, Colucci fundamentally misconstrues Butash's participation in the Administrative Committee's consideration of his appeal. An attorney who advises his clients of their fiduciary obligations does not constructively become the beneficiary's representative.

In short, Colucci has provided us with no foundation on which to develop a theory that Agfa operated under a disabling conflict of

interest when it decided to reject his claim for severance benefits. Without some theory and factual foundation, we will not infer a conflict of interest from the generalized facts that Agfa created, funded, and administered the Plan to provide him benefits.

Because Agfa explicitly reserved a right to exercise discretion in administering ambiguous provisions of its own Plan, we conclude that under the holdings of *Firestone* and *Booth*, we must defer to that discretion, so long as it was exercised reasonably, and there is no evidence to suggest that it was exercised unreasonably.

## VI

For the reasons given, the judgment of the district court is reversed, and this case is remanded with instructions to the district court to enter judgment for the Agfa Corporation Severance Pay Plan.

*REVERSED AND REMANDED WITH INSTRUCTIONS*