**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-2529

WILLIAM J. ADAMS,

                                    Plaintiff - Appellee,

          and

JAMES J. SHALVOY, III,

                                    Plaintiff,

          versus

LOUISIANA-PACIFIC CORPORATION; ABT BUILDING
PRODUCTS CORPORATION; ABTCO, INCORPORATED; ABT
BUILDING PRODUCTS CORPORATION SUPPLEMENTAL
BENEFIT PLAN #2; RETIREMENT COMMITTEE FOR THE
ABT BUILDING PRODUCTS CORPORATION SUPPLEMENTAL
BENEFIT PLAN #2,

                                    Defendants - Appellants.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte. Graham C. Mullen, Chief
District Judge. (CA-01-404-3)

Argued: September 21, 2005          Decided: April 26, 2006

Before MOTZ, TRAXLER, and SHEDD, Circuit Judges.

Reversed in part, vacated in part, and remanded by unpublished per
curiam opinion.

**ARGUED:** Bruce A. Rubin, MILLER NASH, L.L.P., Portland, Oregon, for Appellants. Sara Wyche Higgins, KENNEDY, COVINGTON, LOBDELL & HICKMAN, L.L.P., Charlotte, North Carolina, for Appellee. **ON BRIEF:** L. Neal Ellis, Jr., HUNTON & WILLIAMS, L.L.P., Raleigh, North Carolina, for Appellants. Kiran H. Mehta, KENNEDY, COVINGTON, LOBDELL & HICKMAN, L.L.P., Charlotte, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

In this ERISA case, the Louisiana-Pacific Corporation's ("LP") Retirement Committee, which is the plan administrator of Supplemental Benefit Plan # 2 (the "Supplemental Plan"), excluded the stock option income of William J. Adams in calculating his retirement benefits and also actuarially reduced his benefits because he retired before age 65. Adams filed suit, alleging that the LP Retirement Committee improperly reduced his retirement benefits. After the parties filed cross-motions for summary judgment, the district court denied the defendants' motion for summary judgment but granted Adams' motion for summary judgment.[1] The defendants now appeal. Because we hold that the LP Retirement Committee did not abuse its discretion, we reverse the district court's grant of summary judgment in favor of Adams, vacate its orders calculating benefits and awarding attorneys' fees, and remand for further proceedings.

---

[1] The district court actually also granted part of the defendants' motion for summary judgment and denied part of Adams' motion for summary judgment. Although Adams argued in its motion for summary judgment that approximately $230,000 of severance pay he received through October 2000 should have been included in calculating his benefits, the district court concluded that the Supplemental Plan prohibited including this income. Because Adams has not appealed the district court's grant of summary judgment in favor of the defendants on this issue, that portion of the district court's judgment is not before us.

3

Adams was hired as an executive at ABTco, Inc. in 1992 and participated in both its Retirement Plan and Supplemental Plan. The Supplemental Plan was designed to provide additional retirement benefits for only a select group of ABT's top executives. The Supplemental Plan contains many of the same contractual provisions contained in the Retirement Plan.

In 1998, Adams exercised his ABT stock options worth approximately $185,000. All of this stock option income was included in his 1998 Form W-2.

On January 18, 1999, in anticipation of the planned acquisition of ABT by LP, ABT established a golden parachute plan entitling Adams and five other ABT top executives to receive severance benefits after LP acquired control of ABT. This severance pay package provided for a cash out of stock options, eighteen months of severance pay, and several other benefits. The day after ABT established its golden parachute plan LP agreed to acquire ABT, and the LP Retirement Committee became the plan administrator of ABT's Retirement Plan and Supplemental Plan. Thereafter, any benefits awarded under the Supplemental Plan were to be funded directly from the general assets of LP.

Adams terminated his employment with ABT on April 30, 1999, and became an employee of LP the next day. In 1999, Adams cashed out his remaining ABT stock options worth approximately $870,000.

All of this cancellation stock option income was reported on Adams'
1999 Form W-2.  Although Adams remained an employee at LP through
2000, he was also paid approximately $230,000 in 2000 in severance
pay under ABT's golden parachute plan.

Retirement benefits under the Supplemental Plan are based on
the retiring employee's average "Compensation" over a specified
five-year period multiplied by his years of service.  Although
"Compensation" is not defined in the Supplemental Plan, section 4.1
of the Supplemental Plan expressly adopts the definition of that
term in the related Retirement Plan.  Section 5.1 of the Retirement
Plan defines "Compensation" as:

> the compensation reported as wages on participant's Form
> W-2, plus salary deferral contributions . . . , <u>excluding</u>
> other deferred compensation, reimbursements, <u>fringe
> benefits</u>, moving expenses and welfare benefits . . . .

J.A. 173 (emphasis added).  ABT hired an outside actuary ("the
retained actuary") to perform its benefits calculations.

One difference between the Retirement Plan and the
Supplemental Plan is that the Retirement Plan has a specific
provision -- section 5.3 -- that actuarially reduces monthly
benefits if a participant retires before age 65.  Although the
Supplemental Plan has no such specific provision, it distinguishes
between "normal" and "early" retirement dates.  The Supplemental
Plan also provides that "[u]nless otherwise indicated, the terms
used in this Plan shall have the same meaning as set forth in the
Retirement Plan."  J.A. 392.  The Retirement Plan defines "normal

5

retirement date" as "the date the participant attains age 65," and defines "early retirement date" as "the first day of the calendar month coincident with or next following the date of the participant's retirement from the employ of the company . . . before his or her normal retirement date but after having attained age 55."  J.A. 66.

The administrative record reveals that in 1995 the ABT Retirement Committee considered several issues under the Supplemental Plan, including whether benefits should be actuarially reduced for early retirement.  The ABT Committee proposed several amendments to the Supplemental Plan, one of which was to pay early retirement benefits on an unreduced basis.  The retained actuary analyzed the effect the early retirement amendment would have on the Plan and recommended that it not be adopted because it would be too costly.  Despite this recommendation, ABT adopted the amendment to the Supplemental Plan in July 1995, which provided that early retirement benefits would be paid "on an unreduced basis."  J.A. 386.  All of the other proposed amendments were also adopted.

However, two months later in September 1995, ABT issued a revised Supplemental Plan, which included all of the provisions adopted by ABT in July 1995 except for the provision requiring that early retirement be paid "on an unreduced basis."  It is undisputed that all benefits paid under this Supplemental Plan (and all

6

earlier and later versions of the Plan) were actuarially reduced for those retiring before age 65.[2]

In September 1999, Adams requested from ABT a benefits calculation under the Retirement Plan and the Supplemental Plan for three different start-payment dates, 1999 (when Adams turned 58), 2003 (when Adams turned 62), and 2006 (when Adams turned 65). ABT provided to its retained actuary the amounts of Adams' compensation for the five-year period 1995 through 1999 and requested a benefits calculation for Adams. In performing the requested calculations, the actuary included the income Adams received from the cancellation of his stock options in 1999. The retained actuary provided its calculations to the LP Retirement Committee, explaining that it included the stock option income because the "plan definition of compensation is essentially W-2, thus, if the exercised options are included in W-2, we will use them." J.A. 910.

In October 1999, the LP Retirement Committee passed a Resolution relating to both the ABT Retirement Plan and the Supplemental Plan. According to this Resolution, "payments received in 1999 by participants in the Plans . . . in consideration for the cancellation of certain outstanding stock

---

[2]The retained actuary did not know that the July 1995 amendment requiring payment of early retirement benefits "on an unreduced basis" had been adopted until after Adams sought a calculation of his retirement benefits in 1999.

options . . . do not constitute "Compensation" as defined in Section 5.1 of the Retirement Plan and in Section 4.1 of the [Supplemental Plan]." J.A. 469.

In March 2000, the LP Retirement Committee responded to Adams' request for benefit calculations, indicating that Adams would receive approximately $1,000 a month under the Retirement Plan and approximately $3,000 a month under the Supplemental Plan if he began receiving retirement benefits at age 65. Contrary to its retained actuary's recommendation, the LP Retirement Committee's calculation did not include the more than $1 million of income Adams received from his exercise and cancellation of stock options in 1998 and 1999.

In May 2000, Adams complained to the LP Retirement Committee that its benefits calculation significantly underestimated his Supplemental Plan benefits for several reasons. In particular, he asserted that the calculation should have included the more than $1 million he received in stock option income in 1998 and 1999. Adams cited the retained actuary's previous statement that all income reported on a retiree's Form W-2 should be included in the Supplemental Plan calculation. He also asserted that the $230,000 he would receive in severance pay in 2000 should be included in his benefits calculation. Moreover, Adams argued that the Supplemental Plan did not provide for an actuarial reduction in benefits for retirement before age 65, so he was entitled to begin receiving his

8

benefits on an unreduced basis as of May 1999, when he retired from ABT. Based on his calculation, Adams claimed he was entitled to monthly payments of $6,901 under the Supplemental Plan, substantially more than the estimate provided by the LP Retirement Committee.

In its October 2000 response to Adams, the LP Retirement Committee disagreed that Adams' stock option income should be included in the benefits calculation. Instead, the Retirement Committee asserted that, even though stock option income was included on Adams' Form W-2, it was properly excluded from Adams' benefits calculation because it constituted a "fringe benefit" under the Supplemental Plan's definition of "Compensation." J.A. 1292. The Retirement Committee represented that the Supplemental Plan's definition of "Compensation" was fashioned after the IRS's "safe-harbor" definition to qualify the Plan for certain tax protections and that the Retirement Committee deemed it appropriate -- to ensure compliance with the IRS regulations -- to exclude Adams' stock option income as a fringe benefit. The Retirement Committee also indicated that it would be highly unusual to include such an extraordinary amount of compensation in the calculation since Supplemental Plan benefits were intended to replace the retiree's normal compensation stream, not a compensation stream abnormally enhanced by exercise and cancellation stock option income. The Retirement Committee acknowledged, however, that ABT's

9

prior practice was inconsistent because stock option income was included in some prior benefits calculations but excluded in others.

The LP Retirement Committee also asserted that the Supplemental Plan provides for an actuarial reduction of benefits for those participants who retire before age 65. It reasoned that the July 1995 amendment providing that early retirement benefits would be paid "on an unreduced basis" must have been an administrative mistake and that, at any rate, it was removed from the Supplemental Plan just two months later when the revised Plan document was issued. The Retirement Committee also noted that section 4.2 of the Supplemental Plan provides that benefits are payable at normal and early retirement dates. Because the Retirement Plan requires an actuarial reduction for early retirement and because the Supplemental Plan generally provides that its terms have the same meaning as the terms of the Retirement Plan, the Retirement Committee reasoned that early retirement benefits paid under the Supplemental Plan should be actuarially reduced in the same manner that they are reduced under the Retirement Plan. The Retirement Committee also noted that all previous Supplemental Plan early retirement benefits calculations were actuarially reduced. Last, the Retirement Committee agreed with Adams that he was entitled to draw his benefits starting May 1, 1999.

In December 2000, Adams appealed the LP Retirement Committee's adverse determinations. Adams cited Treas. Reg. § 1.61-21(a)(1), which lists several examples of fringe benefits. Because stock option income is not on that list, Adams reasoned that the IRS did not consider stock option income to be a fringe benefit. Adams also asserted that the IRS has several alternative safe-harbor definitions of "Compensation," one of which specifically excludes stock option income. Thus, Adams asserted that the Plan sponsor must have intended to include stock option income or it would have incorporated the safe-harbor definition specifically excluding it.

Adams also argued that the LP Retirement Committee's rationale for concluding that the Supplemental Plan incorporated the Retirement Plan's actuarial reduction for early retirement was flawed in several respects. He argued that the Supplemental Plan included the terms "normal" and "early" retirement dates merely to specify when payment of retirement benefits are allowed to commence. Adams also noted that the Supplemental Plan does not specifically cross-reference section 5.3 of the Retirement Plan -- the provision that mandates an early retirement actuarial reduction -- which ABT easily could have done if it intended to actuarially reduce early retirement benefits. Adams further noted that ABT specifically included an actuarial reduction in the Supplemental Plan in the case of those participants entitled to a joint and survivor annuity. Thus, Adams reasoned, ABT knew how to

11

actuarially reduce a benefit but "chose to be silent as to actuarial reductions for pre-age 65 commencement of benefits." J.A. 1306 n.7. In response to the Retirement Committee's assertion that all prior Supplemental Plan early retirement benefits calculations had been actuarially reduced, Adams asserted that this prior practice had no relevance because the clear language of the Supplemental Plan does not provide for an actuarial reduction of early retirement benefits.

After receiving Adams' appeal, the LP Retirement Committee obtained a report from Robert Weatherford, the consulting actuary it hired to analyze ABT's prior practice of calculating benefits under its retirement plans. As part of his review, Weatherford interviewed the former administrator of ABT's Retirement Committee and reviewed extensive documentation of ABT's prior benefits calculations. Weatherford determined that there was only one instance, the calculation of retirement benefits for Ron Green, in which the ABT Retirement Committee expressly directed its retained actuary in writing regarding the elements of compensation that should be included in benefits calculations. In the Green calculation, the ABT Retirement Committee staff directed that only "base pay, overtime and bonus amounts can be used in the benefit calculation," and, as a result, more than $900,000 in stock option income was excluded from Green's retirement benefit calculation. J.A. 767. Weatherford determined generally that ABT's retained

12

actuary treated stock option income very inconsistently when calculating retirement benefits under the ABT Retirement plans. In most instances, stock option income was included, but in many instances stock option income was excluded. When stock option income was included in benefits calculations, it appeared that such inclusions resulted from the ABT payroll department providing the retained actuary with only lump sum compensation figures that included stock option income and not from any intentional decision by the ABT Retirement Committee to include stock option income. In some instances, these lump sums also included obvious fringe benefits like moving expenses and automobile allowances that clearly should have been excluded from the benefits calculations. In summary, Weatherford concluded:

> It seems reasonable to assume that prior to the date of [the acquisition of ABT by LP], at no time did the ABTco Plan Administrator or the Retirement Committee make an identifiable effort to consciously include stock options as an element of compensation used in benefit calculations for either the Retirement Plan or [the Supplemental Plan]. It appears more likely that the stock options included in the pension compensation provided to the prior actuary were a result of human error during the process of programming the payroll system, rather than a conscious act on the part of the [ABT] Plan Administrator.

J.A. 842.

In February 2001, the LP Retirement Committee formally upheld its denial of Adams' claims. In response to Adams' claim that Treas. Reg. § 1.61-21 does not include stock option income as a fringe benefit, the Retirement Committee noted that the regulation

13

lists examples of fringe benefits and does not purport to be an exhaustive list. Thus, just because stock option income is not expressly included in the list does not mean that the IRS intended to exclude it from the list. The Retirement Committee further stated it was not persuaded by Adams' argument that the ABT would have used the safe-harbor definition that specifically excluded stock option income if it had intended to exclude stock option income. The Retirement Committee reasoned that there were several other reasons why ABT may have decided to use the alternative safe-harbor definition not specifically excluding stock option income. For instance, the definition ABT chose is perhaps the easiest to administer and, while it does not specifically exclude stock option income, fringe benefit is a sufficiently broad category to encompass stock option income.

As additional support for its conclusion that stock option income should be considered a fringe benefit, the Retirement Committee referenced IRS Publication 15-B, "Employer's Tax Guide to Fringe Benefits." Because this publication includes a discussion of how to treat income derived from stock options, the Retirement Committee reasoned that "in the IRS's view, exercise and cancellation [stock option] income are fringe benefits." J.A. 952.

The Retirement Committee also referenced in detail the recent findings of Weatherford, its consulting actuary, who determined that the past practice by ABT was generally to exclude stock option

14

income under the Supplemental Plan for the most highly compensated executives whenever the benefit calculations were processed manually outside the automated payroll system. It adopted Weatherford's theory that the inclusion of stock option income was most likely a function of how the payroll system was programmed rather than any conscious decision by ABT to include it. Notably, in denying Adams' claim that stock option income should be included in his benefits calculation, the Retirement Committee did not rely on its October 1999 Resolution excluding cancellation stock option income received in 1999 from "Compensation."

The Retirement Committee also upheld its determination that Adams' benefits under the Supplemental Plan should be actuarially reduced because he retired from ABT before age 65. While acknowledging that Adams' interpretation -- that the Supplemental Plan provides for an unreduced benefit -- was a reasonable interpretation, the Retirement Committee concluded that its contrary interpretation more likely was consistent with ABT's intention, especially when the Supplemental Plan is read in context with the Retirement Plan and when viewed in light of ABT's prior consistent practice of actuarially reducing all Supplemental Plan early retirement benefits. The Retirement Committee also reasoned that there would have been no reason for ABT to attempt to amend the Supplemental Plan in July 1995 to provide for unreduced

15

benefits if the Supplemental Plan already prohibited actuarial reduction of early retirement benefits.

After exhausting his administrative remedies, Adams filed this ERISA action against the defendants. Following discovery, the parties filed cross-motions for summary judgment.

In granting summary judgment in favor of Adams, the district court concluded that the Retirement Committee's adoption of the October 1999 Resolution violated the plain terms of section 7.2 of the Supplemental Plan, which prohibits amending the Supplemental Plan without first obtaining written consent of the affected participant. Thus, because Adams did not consent to this amendment to the Supplemental Plan, the district court ruled that the Retirement Committee abused its discretion by refusing to include Adams' stock option income in his benefits calculation.

The district court also concluded that the LP Retirement Committee was bound to apply the July 1995 amendment to the Supplemental Plan mandating that benefits "be paid on an unreduced basis," because there was no documentation establishing that ABT had revoked the amendment. Thus, the district court ruled that the LP Retirement Committee abused its discretion by actuarially reducing Adams' benefits in contravention of the July 1995 amendment.

After issuing its summary judgment order, the district court ordered the parties to recalculate Adams' Supplemental Plan

16

benefits consistent with its rulings.  Without waiving their objections to the court's rulings, the defendants calculated Adams' monthly benefits to be $6,315.83.  Adams calculated that his monthly benefits should be $6,770.25.  The district court adopted Adams' calculation, and entered judgment accordingly.

II.

We review a grant of summary judgment de novo, applying the same standards employed by the district court.  Evans v. Metropolitan Life Ins. Co, 358 F.3d 307, 310 (4th Cir. 2004).  When parties file cross-motions for summary judgment, we must consider each motion separately and view the facts relevant to each in the light most favorable to the nonmoving party.  Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003).

In cases in which the ERISA plan vests the plan administrator with discretionary authority to construe the terms of the plan, we review the administrator's benefits determinations for an abuse of that discretion.  Evans, 358 F.3d at 310.  Under this deferential standard, we will not disturb the administrator's decision if it is reasonable, even if we would have come to a different conclusion independently.  Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000).  A plan administrator's determination is reasonable if it is the product of a deliberate and principled reasoning process and is supported by

17

substantial evidence.  <u>Brogan v. Holland</u>, 105 F.3d 158, 161 (4th Cir. 1997).

However, even when a plan confers discretion on the plan administrator to construe the meaning of the plan's terms, the plan administrator is "not free to alter the terms of the plan or to construe unambiguous terms other than as written." <u>Colucci v. AGFA Corp. Severance Pay Plan</u>, 431 F.3d 170, 176 (4th Cir. 2005).  If a denial of benefits is contrary to the clear terms of the plan, the plan administrator's determination "will constitute an abuse of discretion."  <u>Lockhart v. United Mine Workers of America 1974 Pension Trust</u>, 5 F.3d 74, 78 (4th Cir. 1993).

Section 5.1 of the Supplemental Plan gives the LP Retirement Committee, as the plan administrator, "full discretionary authority to determine an individual's eligibility for benefits . . . and to otherwise interpret and administer the Plan."  J.A. 452.  The parties agree, based on the Plan's grant of discretion, that our review is for an abuse of discretion rather than de novo.  However, Adams argues that the deferential abuse of discretion standard should be lessened because the LP Retirement Committee was acting under a clear conflict of interest.  He claims that the LP Retirement Committee had a financial incentive to reduce Adams' benefits as much as possible because LP would be required to pay the benefits from its general assets and because only ABT, not LP, employees are participants under the Supplemental Plan.  For

18

purposes of our review, we will assume that the LP Retirement Committee was acting under a conflict of interest and will, therefore, reduce the amount of deference to the extent necessary to counteract any undue influence resulting from the conflict. See Doe v. Group Hospitalization & Med. Servs., 3 F.3d 80, 87 (4th Cir. 1993) ("[W]e will review the merits of the [administrator's] interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict").[3]

III.

A.

The defendants argue that the district court erred in concluding that the LP Retirement Committee abused its discretion in determining that Adams' stock option income should not be

---

[3]After oral argument in this case, we issued our opinion in Colucci, 431 F.3d at 179, in which we stated that "the simple and commonplace fact that a plan's administrator is also its funder is not enough to support a finding of a conflict of interest that would cause an adjustment to our deference." Under the particular facts of that case, we declined to lessen the deference under the abuse of discretion standard. Although it is possible that Colucci would support the same result in this case, the defendants have not attempted to supplement their briefs to argue that Colucci should apply to the facts of this case.

19

included in the benefits calculation under the Supplemental Plan. We agree.

The district court ruled that the LP Retirement Committee contravened the clear language of the Supplemental Plan by adopting the October 1999 Resolution amending the Supplemental Plan to exclude stock option income as a component of "Compensation" without obtaining Adams' consent. Thus, the district court concluded that the Retirement Committee abused its discretion by relying on this improper amendment and excluding stock option income from Adam's benefits calculation.

The district court's ruling is incorrect for three reasons. First, the October 1999 Resolution was not an amendment to the Supplemental Plan that required consent by Adams. Instead, the Resolution was simply the LP Retirement Committee's interpretation of the definition of "Compensation," and section 5.1 of the Supplemental Plan expressly authorizes the Retirement Committee "to interpret" the terms of the Plan. Second, even if the Resolution were an impermissible amendment to the Plan, there is no indication that the Retirement Committee relied on the Resolution in deciding during its administrative review of Adams' claim that stock option income was a fringe benefit that must be excluded from the calculation of Adams' benefits. Although the Retirement Committee gave several rationales for its determination that stock option income was excludable, it never mentioned the October 1999

20

Resolution during its administrative review.  Third, the October 1999 Resolution applies only to cancellation stock option income received in 1999, so the Retirement Committee could not have relied on that Resolution in deciding to exclude the exercise stock option income that Adams' received in 1998.

In deciding whether an administrator has abused its discretion, we consider several factors, including, but not limited to: (1) the language of the plan; (2) the sufficiency of the materials considered in making the decision and the extent to which they support it; (3) whether the administrator's determination was consistent with previous interpretations of the plan; and (4) whether the decisionmaking process was reasoned and principled. Booth, 201 F.3d at 342-43.  We conclude that all of these factors support the conclusion that the LP Retirement Committee did not abuse its discretion by deciding to exclude stock option income from Adams' benefits calculation.

First, the language of the Supplemental Plan does not specifically state whether stock option income should be included in calculating benefits.  Instead, the Plan requires the Retirement Committee to take into account all compensation reported on the participant's Form W-2 and then subtract from that figure several particular forms of compensation including fringe benefits. Because the term "fringe benefits" is not defined under the Plan and its meaning is susceptible to more than one meaning, the

21

Retirement Committee acted within its authority in attempting to determine if stock option income reasonably fell within that category of excludable compensation.

Second, the Retirement Committee considered a wide range of materials in reaching its decision. The Retirement Committee hired Weatherford to review how ABT treated stock option income in benefit calculations before LP acquired ABT. Weatherford reviewed voluminous records and also interviewed ABT employees before submitting his results to the Retirement Committee. The Retirement Committee also reviewed various Treasury regulations to determine whether the IRS considered stock option income to be a fringe benefit. Although none of these materials conclusively established that stock option income is a fringe benefit, they provided sufficient support for the Retirement Committee's ultimate conclusion that stock option income should be considered a fringe benefit and should, therefore, be excluded from Adams' benefits calculations.

Third, the LP Retirement Committee's decision was consistent with most of ABT's prior "interpretations" under the Supplemental Plan. It is undisputed that stock option income was not treated consistently by the ABT Retirement Committee in calculating benefits. After reviewing ABT's past practice, Weatherford surmised that, when ABT's Retirement Committee specifically considered whether to include or exclude stock option income, it

22

decided to exclude it.  On the other hand, Weatherford opined that the inclusion of stock option income in calculations did not appear to be based on a specific interpretation of the Supplemental Plan by the ABT Retirement Committee but seemed instead to be the product of the payroll department reporting stock option income in the data it forwarded to the retained actuary.  That data was often incorrect because in some instances it failed to exclude even obvious fringe benefits like automobile allowances and moving expenses.  Under Weatherford's theory, although the LP Retirement Committee's interpretation excluding stock option income was inconsistent with ABT's past "practice" of including it in many instances, it was consistent with those instances in which ABT specifically "interpreted" the Supplemental Plan to exclude stock option income.

Finally, although the LP Retirement Committee's interpretation was not consistent with its retained actuary's recommendation that stock option income be included, the Retirement Committee's refusal to adopt the retained actuary's recommendation is reasonable.  In his September 1999 letter to the LP Retirement Committee, the retained actuary insisted that "the plan definition of compensation is essentially W-2, thus, if the exercised options are included in W-2, we will use them."  This assertion, however, ignores the clear definition of "Compensation" in the Supplemental Plan requiring that several components of "Compensation" that are included on Form

23

W-2, including fringe benefits, must be excluded for purposes of calculating benefits.[4]

Fourth, the LP Retirement Committee's decisionmaking process was reasoned and principled. The LP Retirement Committee thoroughly reviewed ABT's prior practices and interpretations, consulted related Treasury regulations, and carefully responded to Adams' many countervailing arguments. In sum, even considering the Retirement Committee's conflict of interest, its decision to exclude stock option income as a fringe benefit from Adams' benefits calculation was reasonable and supported by substantial evidence.

B.

The defendants next argue that the district court erred in determining that the LP Retirement Committee abused its discretion in deciding to actuarially reduce Adams' benefits for early retirement. We agree.

The district court ruled that the Retirement Committee was required to apply the July 1995 amendment mandating that early

_____

[4]Adams also cites to the retained actuary's November 1999 correspondence to the LP Retirement Committee, even though this letter was not included in the administrative record. Assuming that this letter is properly before us, it does not affect our ruling. The retained actuary reasserts his opinion that "Compensation" is "basically W-2 compensation." J.A. 1076. This letter, like his September 1999 correspondence, does not discuss whether stock option income can be subtracted as a fringe benefit.

24

retirement benefits be paid "on an unreduced basis," because there was no evidence in the administrative record that this amendment had formally been revoked. We conclude that this ruling is not supportable under the particular facts of this case.

Even assuming that the July 1995 amendment was not properly revoked in 1995, Adams would be entitled to rely on it only for his benefits that vested prior to the September 1995 version of the Supplemental Plan, which did not incorporate the July 1995 amendment. It is undisputed that none of Adams' Supplemental Plan benefits vested until after 1995, so the July 1995 amendment would not apply to any of Adams' benefits.

Having found that the basis of the district court's ruling was incorrect, we also conclude that the Retirement Committee's decision to actuarially reduce Adams' benefits was the product of a deliberate and principled reasoning process and is supported by substantial evidence. See Brogan, 105 F.3d at 161. Adams' principal argument that the Retirement Committee abused its discretion because actuarially reducing benefits contravenes the clear language of the Supplemental Plan is not persuasive. The Supplemental Plan does not expressly provide that early retirement benefits must be paid on an unreduced basis. Instead, the Plan sets out a formula to calculate benefits but also distinguishes between "early" retirement and "normal" retirement. Although Adams insists that this distinction is only meant to determine when

benefits may commence, the reason for this distinction is susceptible to more than one reasonable interpretation. Because the Supplemental Plan supplements benefits under the Retirement Plan and shares many of the same terms and meanings, we conclude that it was reasonable for the Retirement Committee to draw inferences from how the Retirement Plan treats early retirement benefits in determining how they should be treated under the Supplemental Plan.

Moreover, we conclude that the Retirement Committee reviewed adequate materials (the prior plan revisions and amendments and prior ABT calculations) in reaching its decision and thoroughly responded to all of the contrary arguments raised by Adams. Finally, it is undisputed that actuarially reducing benefits for early retirement is entirely consistent with ABT's prior practice under the Supplemental Plan.

C.

The defendants also argue that the district court erred in adopting Adams' calculation of benefits and awarding attorneys' fees. Because our opinion reversing the judgment of the district court on the stock option and early retirement issues will necessarily affect the district court's benefits calculations, we decline to address the defendants' additional arguments at this time. Instead, we vacate the district court's orders calculating

26

benefits and awarding attorneys' fees and remand for further proceedings.

IV.

We hold that the LP Retirement Committee did not abuse its discretion in deciding to exclude Adams' stock option income in his benefits calculation. We also hold that the LP Retirement Committee did not abuse its discretion in actuarially reducing Adams' benefits for early retirement. Accordingly, we reverse the grant of summary judgment in favor of Adams, vacate the orders calculating benefits and awarding attorneys' fees, and remand for further proceedings consistent with this opinion.

REVERSED IN PART,
VACATED IN PART,
AND REMANDED

27