**Kathy H. GECY, Plaintiff,**

v.

**SERVICE CARE, INC., and Sun Life Assurance Company of Canada, Defendants.**

**C.A. No.: 9:05–3372–PMD.**

United States District Court, D. South Carolina, Beaufort Division.

Oct. 19, 2006.

---

Harold Fred Kuhn, Jr., Moss Kuhn and Fleming, Beaufort, SC, for Plaintiff.

Christine Gantt Sorenson, Haynsworth Sinkler Boyd, Greenville, SC, for Defendants.

## ORDER

DUFFY, District Judge.

This matter is before the court upon Defendants Sun Life Assurance Company of Canada's ("Sun Life") and Service Care, Inc.'s ("Service Care") motion for summary judgment[1]. For the reasons set forth herein, the court grants Defendants' motion.

## BACKGROUND

### I. Procedural History

On November 2, 2005, Plaintiff Kathy H. Gecy ("Gecy" or "Plaintiff") brought this action in the Court of Common Pleas for Beaufort County, South Carolina, seeking to recover continuing benefits under a long term disability plan. Specifically, Plaintiff asserts causes of action for breach of contract and breach of fiduciary duty. However, on December 2, 2005, Defendants Service Care and Sun Life removed the case to this court, asserting jurisdiction under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

On July 24, 2006, Defendants Service Care and Sun Life filed a motion for summary judgment, alleging that ERISA preempts Plaintiff's state law causes of action and that Sun Life did not abuse its discretion in denying Plaintiff's claim for continuing disability benefits under the long term disability plan.[2] Plain-

---

1. In her Return to Defendants' Motion for Summary Judgment, Plaintiff consented to the dismissal of Service Care, leaving Sun Life as the sole Defendant. (Plaintiff's Return at 2.)

2. Defendants Service Care and Sun Life also assert Plaintiff's claims should be dismissed for failure to prosecute and failure to comply

with court order. (Defendants' Memorandum at 14–16.)

A dismissal with prejudice is a harsh sanction which should not be invoked lightly in view of the sound public policy of deciding cases on their merits. Against this policy, the district court must balance considerations of sound judicial administration, applying four criteria: (1) the degree of personal responsibility on the part of the

tiff filed a memorandum in opposition to Defendant's motion on September 1, 2006, asserting that a *de novo* standard of review applies but that regardless of which standard the court applies, Sun Life improperly terminated Plaintiff's benefits.[3] Defendant Sun Life filed a reply on September 18, 2006, asserting it is entitled to summary judgment under either a *de novo* or an abuse of discretion standard.

## II. Factual Background

Plaintiff was employed by Service Care as an outside sales representative for SCANA Security, and on March 2, 2000, she was injured when she accidentally slammed her right shoulder into a door frame. (Admin. Record at 1438.) Plaintiff filed an application for disability benefits on March 15, 2000, and she received these benefits for thirty months. Plaintiff further injured her arm on April 13, 2004, when she sustained an "impacted fracture of the surgical neck of her right humerus" and a fracture to her left ring finger. (Admin. Record at 434.) On December 28, 2004, Sun Life notified Plaintiff that it was terminating her disability benefits. (Admin. Record at 482–83.) Plaintiff appealed on February 22, 2005, and submitted additional information. (Admin. Record at 501, 556, 558, 560.) After a review by two physicians, Sun Life affirmed the denial of Plaintiff's benefits on May 16, 2005. (Admin. Record at 531–35.)

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Sum-

---

plaintiff; (2) the amount of prejudice to the defendant caused by the delay; (3) the presence or absence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal.

*Davis v. Williams,* 588 F.2d 69, 70 (4th Cir. 1978) (internal quotation marks omitted) (citations omitted). This court determines that dismissal for failure to prosecute and failure to comply with court order is not appropriate. While Defendants' counsel made several unsuccessful attempts to contact Plaintiff's counsel, Defendants have not demonstrated preju-

dice resulting from those failed attempts. Moreover, there is no evidence that Plaintiff has a history of proceeding in a dilatory manner. It cannot be said that Plaintiff has abandoned her claims, as Plaintiff has responded to Defendants' motion for summary judgment. This court finds the policy of deciding this case on its merits outweighs the criteria from *Davis.*

3. Plaintiff agrees her state law claims are preempted by ERISA. (Plaintiff's Return at 3.)

mary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

## ANALYSIS

### I. Standard of Review for Denial of Disability Benefits

 "[A] court reviewing the denial of disability benefits under ERISA initially must decide whether a benefit plan's language grants the administrator or fiduciary discretion to determine the claimant's eligibility for benefits...." *Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 268 (4th Cir.2002) (citing *Feder v. Paul Revere Life Ins. Co.,* 228 F.3d 518, 522 (4th Cir.2000)). If the plan language grants discretion to the administrator, the court reviews the denial under an abuse of discretion standard. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Johannssen v. Dist. No. 1–Pac. Coast Dist., MEBA Pension Plan,* 292 F.3d 159, 168 (4th Cir.2002). Otherwise, the appropriate standard of review is *de novo. See Firestone Tire & Rubber Co.,* 489 U.S. at 111, 115, 109 S.Ct. 948; *Johannssen,* 292 F.3d at 168. Although "[n]o specific phrases or terms are required in a plan to preclude a de novo standard of review, ... [i]f a plan does not clearly grant discretion, the standard of review is de novo." *Gallagher,* 305 F.3d at 268–69 (citing *Feder,* 228 F.3d at 522, 524).

*Gallagher v. Reliance Standard Life Insurance Company,* 305 F.3d 264 (4th Cir. 2002), is the controlling authority in this circuit for purposes of determining the appropriate standard of review. In that case, the court was interpreting the following language: "We will pay a Monthly Benefit if the Insured ... submits satisfactory proof of Total Disability to us." *Gallagher,* 305 F.3d at 269. The court noted the ambiguity in this provision:

> There are two possible ways to interpret this language: (1) that Gallagher must submit to Reliance satisfactory proof of his disability or (2) that he must submit proof of his disability that is satisfactory to Reliance. The former interpretation would require Gallagher to submit to Reliance proof of a total disability that is objectively satisfactory; to determine whether Gallagher met this objective standard, we would review Reliance's denial of his claim de novo. The latter interpretation, however, would require Gallagher to submit to Reliance proof of a total disability that Reliance finds subjectively satisfactory; to determine whether Gallagher met this subjective standard, we would review Reliance's denial of his claim for abuse of discretion.

*Id.* (citations omitted). The Fourth Circuit determined the language did not grant discretionary authority because "a grant of discretion must be clear" and because "an insured employee reading this language would most likely interpret 'to us' as an indication of where to submit the proof, not as granting Reliance discretion to determine whether the proof was satisfactory." *Id.* at 269–70.

In a footnote, the court noted that although Reliance has to determine "whether a claimant has submitted satisfactory proof, this 'implies nothing one way or the other about the scope of judicial review of [its] determination.' " *Id.* at 270 n. 6 (quoting *Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 332 (7th Cir.2000)). Because the reservation of discretion must be clear, "[f]inal authority to make eligibility determinations is not delegated by 'the mere fact that a plan requires a determination of eligibility or entitlement by the administrator, or requires proof or satisfactory

proof of the applicant's claim, or requires both a determination and proof (or satisfactory proof).' " *Id.* (quoting *Herzberger,* 205 F.3d at 332).

■ Using *Gallagher* as a guide, this court determines the appropriate standard of review in this case is abuse of discretion.[4] The language in the policy issued by Sun Life is very different from the language the Fourth Circuit interpreted in *Gallagher.* Sun Life's policy states, "Proof must be satisfactory to Sun Life." (Admin. Record at 38.) The ambiguity recognized in *Gallagher* does not exist in this language because this provision of Sun Life's policy cannot be read as an indication of where a claimant should submit his or her proof. Rather, the fact that "[p]roof must be satisfactory to Sun Life" indicates that proof must be subjectively satisfactory to Sun Life. Moreover, the language in Sun Life's policy is very similar to the "latter interpretation" the Fourth Circuit referenced in *Gallagher. See Gallagher,* 305 F.3d at 269.

■ Under the abuse of discretion standard, the " 'discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion.' " *Smith v. Continental Cas. Co.,* 369 F.3d 412, 417 (4th Cir.2004) (quoting *Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan,* 201 F.3d 335, 341 (4th Cir.2000)). This means that so long as the denial of benefits is the result of " 'a deliberate, principled reasoning process and ... is supported by substantial evidence,' " it will not be disturbed. *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir. 1997) (quoting *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 787 (4th Cir.1995)). However, Plaintiff asserts that if this court finds abuse of discretion is the appropriate standard of review, that standard should be modified due to the presence of a conflict of interest. (Plaintiff's Return at 9–10.) Sun Life does not appear to argue that a conflict of interest does not exist but says that a court may consider a conflict of interest as a factor in determining the reasonableness of a decision. (Defendant's Reply at 6.) As Sun Life both insures and administers the plan, this court determines a modified abuse of discretion standard is appropriate. *See Colucci v. Agfa Corp. Severance Pay Plan,* 431 F.3d 170, 179 (4th Cir.2005); *Doe v. Group Hospitaliza-*

4. Other courts have held that similar language triggers discretionary review. *See Nance v. Sun Life Assurance Co. of Can.,* 294 F.3d 1263, 1268 (10th Cir.2002) ("[W]e hold that the 'satisfactory to Sun Life' language suffices to convey discretion to Sun Life in finding the facts relating to disability. In our view, this language adequately conveys to the Plan participants and beneficiaries that the evidence of disability must be persuasive to Sun Life."); *Ferrari v. Teachers Ins. & Annuity Ass'n,* 278 F.3d 801, 806 (8th Cir.2002) (finding an abuse of discretion standard is appropriate when the plan "specifies that the employee must provide written proof of continued total disability at reasonable intervals to be determined by TIAA and that such proof must be satisfactory to TIAA"). The Ninth Circuit, however, has recently interpreted identical language as requiring a de novo standard of review. *See Febusch v. Integrated Device Tech., Inc. Employee Benefit Plan,* 463 F.3d 880, 883 (9th Cir.2006) ("The dispositive policy language in Feibusch's case is that proof of a disability claim 'must be satisfactory to Sun Life.' This language does not unambiguously provide discretion to the plan administrator."). However, when a court deems a de novo standard appropriate, the language is often very similar to that in *Gallagher. See Perugini–Christen v. Homestead Mortgage Co.,* 287 F.3d 624, 626 (7th Cir. 2002) (stating that de novo review is appropriate when the plan required the claimant to submit "satisfactory proof of Total Disability to [Reliance]"); *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 251–52 (2d Cir.1999) (using a de novo standard of review for a policy providing, "We will pay a Monthly Benefit if an Insured ... submits satisfactory proof of Total Disability to us.").

*tion & Med. Servs.*, 3 F.3d 80, 85–87 (4th Cir.1993).

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court said, "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* at 115, 109 S.Ct. 948 (quoting RESTATEMENT (SECOND) OF TRUSTS § 187 cmt. d (1959)). Accordingly, the Fourth Circuit has modified this deferential standard:

> We hold that when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

*Doe*, 3 F.3d at 87. "'[I]n no case does the court deviate from the abuse of discretion standard. Instead, the court modifies that abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.'" *Smith*, 369 F.3d at 418 (quoting *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir.1997)). Since Sun Life had significant incentives to benefit itself by

denying benefits, its decision to deny benefits must be more objectively reasonable and supported by more substantial evidence. *Ellis*, 126 F.3d at 233. The issue essentially "comes down to whether plaintiff received a full and fair review." *Willis v. Baxter Int'l, Inc.*, 175 F.Supp.2d 819, 831 (W.D.N.C.2001).

The court must now determine whether Sun Life's denial of benefits was an abuse of discretion under the modified abuse of discretion standard, or whether Plaintiff in fact received a full and fair review of her claim for benefits. To make that determination, it is necessary to review the relevant language of the policy.

## II. Policy Provisions

■ Sun Life's group term insurance policy provides long term disability benefits to Plaintiff if she is disabled within the meaning of the policy, which states:

> Total Disability or Totally Disabled means during the Elimination Period and the next 24 months of Total Disability, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation. After benefits have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training or experience.

(Admin. Record at 13.) The policy also contains the following limitations:

> [1. A]ny period of Total or Partial Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care.

> Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.

Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution licensed to provide psychiatric treatment. [2. A]ny period of Total or Partial Disability due to Musculoskeletal and Connective Tissue Illness, unless the Employee is under the continuing care of a Physician providing appropriate treatment by means of examination and testing in accordance with the disabling condition.

Benefits will be payable for the first 24 months after the Employee completes his Elimination Period.

Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution.

(Admin. Record at 27–28.) The policy defines "Musculoskeletal and Connective Tissue Illness" as including fibromyalgia. (Admin. Record at 11.) Plaintiff would thus "not be entitled to disability benefits after the first 24 months if her disability were due solely to fibromyalgia." (Plaintiff's Return at 4.)

### III. Sun Life's Denial of Plaintiff's Claim for Benefits

The only remaining issue before this court is whether Sun Life abused its discretion in determining that Plaintiff's disability was due solely to fibromyalgia and depression. Since her injury on March 2, 2000, Plaintiff has seen several different doctors, including Drs. Dean, Harper, Waid, and Salzer. Drs. Sarni, Lewin, and Stratford conducted physician reviews.

### A. Dr. Dean

Dr. Dean saw Plaintiff on March 9, 2000, soon after her injury, and his initial diagnosis was (1) rotator cuff calcific tendonitis with impingement and (2) possible adhesive capsulitis. (Admin. Record at 1368.) Dr. Dean performed surgery on Plaintiff on April 7, 2000, and his postoperative diagnosis was as follows: (1) glenohumeral synovitis, (2) impingement, (3) AC joint degenerative joint disease, and (4) rotator cuff calcific tendinitis. (Admin. Record at 1365.) In May of 2000, Dr. Dean determined Plaintiff suffered from synovitis, impingement, AC joint degenerative disease, and rotator cuff calcific tendonitis. (Admin. Record at 1295.) His notes from a June 2000 visit indicate Plaintiff exhibited "fairly classic traits of fibromyalgia or polymyalgia rheumatica." (Admin. Record at 1361.) He noted in September of 2000 that Plaintiff was having a lot of problems with her fibromyalgia (Admin. Record at 1236); he further diagnosed Plaintiff with radial tunnel, lateral epicondylitis in November of 2000. (Admin. Record at 1234.)

After Sun Life decided to terminate Plaintiff's benefits, Dr. Dean wrote a letter on January 26, 2005, indicating the Plaintiff "has a chronic right upper extremity pain syndrome with loss of mobility of the shoulder and chronic pain." (Admin. Record at 556.) The letter further stated, "There really is no medical solution to this problem. She has failed conservative and surgical treatment and this is going to be a permanent, chronic, impairment." (Admin. Record at 556.)

### B. Dr. Harper

Dr. Harper wrote a letter to Dr. Dean on July 18, 2000, in which he discussed Plaintiff's diagnosis. (Admin. Record at 1258–59.) In this letter, Dr. Harper stated,

As you know, [Plaintiff's] right shoulder essentially became nonfunctional this year.... My assessment of this case is that of adhesive capsulitis of the right shoulder, most likely an associative with impingement syndrome and rotator cuff tendonitis. In addition, she does display the classical trigger points of fibromyalgia.... What complicates this case is

the appearance of 2 painful co-existing conditions, which probably have aggravated each other. (Admin. Record at 1258–59.) Dr. Harper's notes from an office visit on November 20, 2000, list Plaintiff's problems: fibromyalgia, impingement syndrome right shoulder, adhesive capsulitis, depression, and possibly left lateral epicondylitis. (Admin. Record at 1189.) In the "assessment" section of his notes from this visit, Dr. Harper states that "fibromyalgia continues to be a central issue with her." (Admin. Record at 1189.) On April 4, 2001, Dr. Harper's notes state, "It is my belief, based on her physical findings and symptoms that most of her symptoms now are reflective of ongoing fibromyalgia." (Admin. Record at 1185.)

As of January 14, 2004, Dr. Harper indicated on an Attending Physician's Statement that Plaintiff's diagnosis fibromyalgia. (Admin. Record at 275.) His notes from an office visit on September 23, 2004, list the following problems: fibromyalgia, impingement syndrome right shoulder, adhesive capulitis, depression, bursitis—right knee, GI bleeding, osteoporosis, possibly left lateral epicondylitis. (Admin. Record at 461.) The "assessment" section of the notes from this visit state that Plaintiff has "[m]ultiple issues, centrally fibromyalgia related, but also persistent problems with the left hand injury, osteoporosis ..., osteoarthritis and obesity ..." (Admin. Record at 461.)

On December 7, 2004, Sun Life faxed a letter to Dr. Harper in which Sun Life indicated its assessment that *"from an orthopedic standpoint only*, [Plaintiff] has the ability to perform at the sedentary exertional level on a full-time basis, as long as she has the ability to sit and stand intermittently." (Admin. Record at 457.) Sun Life asked whether Dr. Harper agreed with this assessment, and on December 16, 2004, Dr. Harper indicated he did not agree, referencing his notes from the office visit of September 23, 2004. (Admin. Record at 457–58.) On December 17, 2004, Sun Life sent a fax to Dr. Harper, asking, "In your opinion, is [Plaintiff] unable to work at a sedentary exertional level on a full-time basis due to her persistent symptomatology related to her Fibromyalgia?" (Admin. Record at 467.) If the answer was no, Sun Life requested Dr. Harper to "identify the specific diagnosis that is impacting her functional capacity and inability to perform sedentary work on a full-time basis." (Admin. Record at 467.)

When Dr. Harper responded to this fax on December 17, 2004, he indicated "no" but did not identify a specific diagnosis impacting Plaintiff's functional capacity. (Admin. Record at 471.) Sun Life then called Dr. Harper's office and informed his office that if Dr. Harper felt fibromyalgia was the "primary diagnosis that was precluding ... [Plaintiff] from performing sedentary work, to cross out No and put Yes and put [Dr. Harper's] initial's [sic] beside it." (Admin. Record at 671.) The record indicates that Dr. Harper then changed his response to the question from "no" to "yes." (Admin. Record at 475.)

After Sun Life terminated Plaintiff's benefits, Dr. Harper wrote a letter dated January 3, 2005. This letter stated,

This is a letter to certify that [Plaintiff] is currently under my care for fibromyalgia, osteoporosis and right shoulder impingement syndrome with a history of adhesive capsulitis.... She is currently medically disabled based on persistent right shoulder disease with chronic impingement and concurrent fibromyalgia syndrome ... Right shoulder symptoms have been chronic and currently persist, and as of 1/3/05, she has been scheduled for a repeat shoulder MRI scan prior to

consideration for a second arthroscopic surgery for further decompression. (Admin. Record at 558.)

### C. Dr. Waid

Plaintiff received psychiatric treatment from Dr. Waid, and in October of 2001, Dr. Waid indicated Plaintiff suffered from chronic pain secondary to fibromyalgia. (Admin. Record at 1098.) In November and December of 2001, Dr. Waid indicated plaintiff had chronic pain secondary to fibromyalgia and morbid depression. (Admin. Record at 1096–97.) In an Attending Physician's Statement dated May 13, 2003, Dr. Waid's diagnosis was chronic pain secondary to fibromyalgia, depressive disorder, and cognitive disorder. (Admin. Record at 144.) On June 21, 2004, Dr. Waid noted that Plaintiff suffers from "chronic pain/fibromyalgia" intensified by her fall. (Admin. Record at 408.)

### D. Dr. Salzer

On May 28, 2004, Plaintiff saw Dr. Salzer. (Admin. Record at 426.) In his notes from this visit, Dr. Salzer indicates that Plaintiff's MRI scan revealed her fracture "has actually healed very nicely." (Admin. Record at 426.) After an EMG/NCV, Dr. Salzer noted some abnormalities in Plaintiff's neck on June 15, 2004. (Admin. Record at 424.) In his notes from an office visit of June 21, 2004, Dr. Salzer states, "I have reviewed [the MRI of Plaintiff's neck] with Dr. Strohmeyer and it actually looks very good. We do not see anything from a structural standpoint to account for her pain. . . . Recalling [Plaintiff] has a pretty severe fibromyalgia, it is quite possible that this trauma has caused an episode." (Admin. Record at 423.) On July 22, 2004, Dr. Salzer said that Plaintiff "has really turned the corner with her shoulder function" but that "[s]he is having lots of trouble with fibromyalgia type symptoms . . ." (Admin. Record at 421.)

Plaintiff again visited Dr. Salzer on January 13, 2005. His notes state, "[Plaintiff] got her MRI scan of the shoulder which demonstrates chronic tendinosis of the rotator cuff. . . . It looks like she has recurrent impingement with rotator cuff disease. In my opinion, this is a continuation of her previous chronic condition punctuated by a very severe shoulder fracture." (Admin. Record at 501.) Like Drs. Dean and Harper, Dr. Salzer wrote a letter after Sun Life terminated Plaintiff's benefits. (Admin. Record at 560.) This letter states,

> [Plaintiff's] fracture has gone on to heal and she has improved considerably although she still has permanent problems from her original injury back in 2000. Somewhere along the line, you misconstrued my notes when on one of the visits I stated "she has turned the corner with her shoulder function." This by no means implied any improvement in her long term disability. What I was referring to was improvement in the healing of her fracture and its treatment thereof. . . . I will tell you right now that this woman is disabled with her shoulder.

(Admin. Record at 560.)

### E. Dr. Sarni

On March 31, 2004, Dr. Sarni conducted a physician review; he was asked to determine if Plaintiff's "primary disabling condition is that of Fibromyalgia." (Admin. Record at 344.) This review provided,

> [T]here is no orthopedic data contained within the chart that would support the conclusion that the [Plaintiff] has a Class 5, severe limitation of functional capacity and incapable of minimum activity. The orthopedic data contained within the chart is positive only for multiple tender areas and a diagnosis of fibromyalgia. . . . In summation, there is no data in the chart to support any reason, from

an orthopedic point of view, that the insured is unable to work a sedentary occupation as long as she has an ability to sit and stand intermittently.

(Admin. Record at 347.)

Dr. Sarni conducted a second review on November 24, 2004, and he noted that since his last review, Plaintiff sustained a fracture to her right humerus. (Admin. Record at 446.) Dr. Sarni's second review states,

> Regarding the right shoulder, there is data to support that the [Plaintiff] had a significant impairment in the right shoulder from 4/14/04 through July '04. It would be reasonable to restrict the insured from performing any functional activity with the right shoulder during that time period.
>
> However, otherwise, the conclusions of my March 31, 2004 review remain intact. Specifically, there is no data contained within the chart to support the conclusion that the insured is unable to perform a sedentary occupation with the possible exception of an occupation that would require dexterous use of the right upper extremity from the time 4/13/04 through 7/22/04.

(Admin. Record at 447.)

### F. Dr. Lewin

Dr. Lewin conducted a physician review of Plaintiff's file on March 11, 2005. (Admin. Record at 493–94.) In his comments, Dr. Lewin stated,

> An area of difficulty with this case arises from the requirement that the reviewer discriminate between dysfunction attributed to fibromyalgia from that which has another cause . . .
>
> . . .
>
> If one were to assign R & Ls [(restrictions and limitations)] based on her subjective complaints and on Dr. Harper's findings of exquisite tenderness of the shoulder muscles those would preclude

using that right arm for most tasks, even of a desktop nature, due to pain, but those limitations would be attributable to her fibromyalgic-like syndrome for which the notes indicate benefits are no longer payable. As far as I can tell her shoulder joint itself is fairly functional and based on that finding she'd be theoretically capable of light to sedentary table top work or the equivalent, with some limitation of overhead reaching and activity as her range of joint motion was full on last objective exam, 7/23/04.

(Admin. Record at 493–94.)

### G. Dr. Stratford

Dr. Stratford conducted a physician review of Plaintiff's file on April 22, 2005. (Admin. Record at 525–26.) Dr. Stratford noted it was "difficult to determine functionality of the shoulder because no specialist documents and thorough orthopedic evaluation (range of motion, strength)" were in the file. (Admin. Record at 526.) She said, however, that "based on review of the file, I see no objective finding to support inability to perform sedentary duty." (Admin. Record at 526.)

### H. Deliberate, Principled Reasoning Process and Substantial Evidence

Sun Life's decision to terminate Plaintiff's long term disability benefits resulted from a deliberate and principled process and is supported by substantial evidence. Before Sun Life terminated Plaintiff's benefits on December 28, 2004, Sun Life asked Dr. Sarni to perform a physician review on two different dates. On March 31, 2004, Dr. Sarni concluded the data in the chart did not "support any reason, from an orthopedic point of view, that the [Plaintiff] is unable to work a sedentary occupation." (Admin. Record at 347.) He reached the same conclusion in his review on November 24, 2004. (Admin. Record at 447.)

After Plaintiff appealed the termination of benefits, Sun Life asked Drs. Lewin and Stratford to conduct physician reviews. (Admin. Record at 493, 525.) Dr. Lewin concluded that any restrictions and limitations on Plaintiff's ability to perform sedentary work "would be attributable to her fibromyalgic-like syndrome." (Admin. Record at 494.) Dr. Stratford reached a similar conclusion, seeing "no objective finding to support inability to perform sedentary duty." (Admin. Record at 526.)

Plaintiff appears to argue Sun Life abused its discretion in terminating Plaintiff's benefits because Sun Life "totally *ignores the overwhelming medical documentation which was in Sun Life's possession,*" particularly the documentation from Dr. Harper. (Plaintiff's Return at 21.) Even if the documentation from Dr. Harper clearly indicated Plaintiff was disabled due to fibromyalgia and another condition, Sun Life did not abuse its discretion by relying on the opinions of different doctors. *See Tickle v. Long Term Disability Plan of Marathon Ashland Petroleum, LLC,* 34 Fed.Appx. 909, *4 (4th Cir.2002) (unpublished) (noting a plan administrator does not have to rely on a treating physician's opinion when persuasive contradictory evidence exists); *Palmer v. Prudential Ins. Co. of America,* 215 F.3d 1320, 2000 WL 655944, *2 (4th Cir.2000) (unpublished table decision) (upholding summary judgment terminating benefits under the modified abuse of discretion standard where the question of whether claimant was "totally disabled amounted to nothing more than a difference of opinion between two physicians" (internal quotation marks omitted)); *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 606 (4th Cir.1999) ("The Fourth Circuit has held that it is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented." (citing *Ellis v. Metro. Life Ins. Co.,* 126 F.3d 228, 234 (4th Cir.1997))).

In summary, this court determines that Sun Life engaged in a deliberate, principled reasoning process and that its decision is supported by substantial evidence. Three different physicians conducted reviews that indicate Plaintiff was capable of performing sedentary work from an orthopedic point of view. The question before this court is not whether Plaintiff is disabled. The question is whether Sun Life abused its discretion in determining fibromyalgia and depression were the diagnoses preventing Plaintiff from performing sedentary work. This court determines Sun Life did not abuse its discretion and therefore grants summary judgment in favor of Sun Life.

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that Sun Life's and Service Care's motion for summary judgment is **GRANTED**.

**AND IT IS SO ORDERED.**